[No. D024621. Fourth Dist., Div. One. Apr. 23, 1997.]

PALA BAND OF MISSION INDIANS, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF SAN DIEGO COUNTY et al.,
Defendants and Respondents;
SERVCON-SAN MARCOS, INC., Real Party in Interest and Respondent.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Discussion parts III., IV., V., VI., VII., VIII. and X.

568

**COUNSEL**

Alexander & Karshmer, Richard A. Cross, John R. Shordike and Barbara E. Karshmer for Plaintiff and Appellant.

John J. Sansone, County Counsel, Diane Bardsley, Chief Deputy County Counsel, Mark C. Mead, Deputy County Counsel, Peltzer & Oliva,

Wesley W. Peltzer, Nielsen, Merksamer, Parrinello, Mueller & Naylor and James R. Parrinello for Defendants and Respondents.

Jan S. Driscoll as Amicus Curiae on behalf of Defendants and Respondents.

No appearance for Real Party in Interest and Respondent.

## OPINION

**HALLER, J.**—In 1994, San Diego County voters approved Proposition C, an initiative entitled the "Gregory Canyon Landfill and Recycling Collection Center Ordinance." Proposition C amended the San Diego County General Plan (General Plan) and the San Diego County Zoning Ordinance (Zoning Ordinance) to designate an area known as "Gregory Canyon" for use as a privately owned solid waste facility. The initiative conditioned the development of the facility on approval from various state and federal agencies. The initiative placed the responsibility for obtaining the state and federal permits on the "Applicant," defined as "Servcon-San Marcos, Inc. or its assignee or authorized representatives."

Pala Band of Mission Indians[2] (Pala), which owns property near the Gregory Canyon site, petitioned for a writ of mandate, requesting the court to declare the initiative invalid because several of its provisions violated the California Constitution and state law. Pala named the County of San Diego and the San Diego County Board of Supervisors (collectively County) as respondents/defendants, and named Servcon-San Marcos, Inc. (Servcon) as the real party in interest. The County and Servcon filed answers urging the court to deny Pala's petition and to enter judgment in respondents' favor. After considering the parties' written submissions and their counsels' oral argument, the court denied Pala's petition.[3] Pala appeals.

We conclude section 8, subdivision A (Section 8A) of the initiative violates the California Constitution's prohibition on an initiative naming a private entity to "perform any function or to have any power or duty . . . ." (Cal. Const., art. II, § 12.) We determine, however, Section 8A is severable. We reject Pala's additional challenges to Proposition C. Accordingly, we affirm the judgment, except with respect to Section 8A.

---

[2] Pala is a federally recognized Indian tribe located on the Pala Indian Reservation, which is adjacent to the Gregory Canyon site. (25 U.S.C. § 476.)

[3] Another neighboring property owner, Stephen L. Wheeler, also unsuccessfully petitioned for a writ of mandate. Wheeler did not file an appeal.

## Factual Summary

Proposition C, a copy of which is attached to this opinion, contains eight pages of text and two maps. The proposition text is divided into 12 separate sections. We summarize these sections below.[4]

Section 1 states the intent of the initiative measure is to (1) "provide for the siting of a new recycling collection center and . . . solid waste landfill . . ."; (2) "ensure that the [collection center and landfill] . . . fully comply with all environmental laws and regulations . . ."; (3) "amend the General Plan, Zoning Ordinance and other ordinances and policies of the County of San Diego to allow the construction and operation of a [recycling center and landfill] . . . on . . . [the] Gregory Canyon site . . ."; and (4) "provide that at least 1313 acres of the . . . site will be dedicated as permanent open space to create a substantial preservation area . . . ."

Section 2, entitled "Findings and Purpose," sets forth the reasons a new solid waste facility is needed in North San Diego County and the reasons Gregory Canyon is a preferred location for the facility. This section describes a "solid waste crisis" in San Diego County, resulting from "[l]ocal opposition to landfill sites and disagreement between north county cities and the County . . . over the handling of the solid waste system . . . ." The section further states that the Gregory Canyon site was selected as one of the preferred landfill sites based on a 1987 study evaluating 168 alternate sites.

Section 3, entitled "Description of the Project," identifies the location of the Gregory Canyon site, by referring to an attached map, and describes the main features of the project, including a lined landfill, access road and bridge, scale area, recycling collection center, and activities and operation center. Section 3 then states "[t]he Applicant shall be entitled to adjust the size and location of solid waste operations and to alter the proposed facilities based on a detailed site plan to be submitted to the [California] Integrated Waste Management Board for its review and approval as part of the solid waste facilities permit."

Section 4, entitled "Permits," states the applicant "shall secure" or "shall obtain" numerous identified environmental and other regulatory permits and "shall conduct" consultations with specified government agencies.

Section 5, entitled "Mitigation Measures," provides "voter approval of the Project" is conditioned on various "mitigation measures" to ensure "the

---

[4]All further section references are to Proposition C, unless otherwise specified.

Project is constructed and operated in a manner which minimizes its environmental impacts . . . ." Section 5 then lists 18 mitigation measures that the applicant must comply with in operating the facility.

Section 6, entitled "Tipping Fee and Financial Guarantees," states the tipping fee charged "by the Project" cannot exceed the fee currently charged at county-owned landfills, but that the fee schedule "shall be subject to changes or adjustments based upon tipping fees negotiated between the Applicant and various public agencies agreeing to provide solid waste to the Project."

Section 7, entitled "Implementation" contains four subparts. Sections 7, subdivision A (Section 7A) and 7, subdivision B (Section 7B) amend the County General Plan, subregional plans, community plans, and the County Zoning Ordinance to designate the Gregory Canyon site for use as a solid waste facility. Sections 7, subdivision C (Section 7C) and 7, subdivision D (Section 7D) direct the County to make all necessary amendments to ordinances, rules and regulations, the general plan, subregional and community plans, and the Zoning Ordinance. Section 7D provides the County "shall cooperate with the Applicant wherever possible in issuing permits and approvals so that the Project can proceed in a timely fashion."

Section 8 is the "Definitions" section. Section 8A defines "Applicant" as "Servcon-San Marcos, Inc. or its assignee or authorized representatives." Section 8, subdivision D (Section 8D) defines "Project" as "the recycling collection center and landfill and associated structure and improvements as described in Section 3 of this initiative measure *as subsequently modified by a detailed site plan submitted by Applicant* to the [California] Integrated Waste Management Board as part of the solid waste facilities permit." (Italics added.) Section 8B identifies the location of the Gregory Canyon site.

Section 9 recognizes the private ownership of the proposed solid waste site. The section states, "[t]he Gregory Canyon site shall remain private land until purchased by a public agency or Joint Powers Authority for its fair market value. Nothing contained herein shall restrict the right of any public agency to exercise its eminent domain power as authorized by law to acquire the Gregory Canyon site."

Section 10 provides "[t]his measure may be amended or repealed only by a majority of the voters voting in an election thereon."

Section 11 contains a severability clause, stating that if one portion of the initiative is declared invalid, "such decision shall not affect the validity of the remaining portions of this measure."

Section 12 sets forth rules governing the initiative's relationship with other ballot measures.

## DISCUSSION

### I. General Overview

The main purpose of Proposition C is to amend the General Plan[5] and Zoning Ordinance to permit a solid waste facility—constructed and operated in compliance with all relevant environmental laws and regulations—to be located at the Gregory Canyon site. Our Supreme Court has long held zoning ordinances are subject to amendment by initiative (see *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 516 [169 Cal.Rptr. 904, 620 P.2d 565]) and recently confirmed that a general plan may also be amended by initiative. (*DeVita* v. *County of Napa, supra*, 9 Cal.4th at p. 775.) The court has further "specifically recognized that the Legislature conceives land-use planning as legislative action—part of the political process—and not as 'something distinct from the local legislative function, to be performed by an apolitical planning commission.' (*DeVita* v. *County of Napa, supra*, 9 Cal.4th at p. 773, fn. 3.)" (*Memorial Hospitals Assn.* v. *Randol* (1995) 38 Cal.App.4th 1300, 1313-1314 [45 Cal.Rptr.2d 547].)

We are additionally mindful of the substantial public concern with proper solid waste management and appropriate landfill siting in this state. In 1989, the Legislature declared "[t]he amount of solid waste generated in the state coupled with diminishing landfill space and potential adverse environmental impacts from landfilling constitutes an urgent need for state and local agencies to enact and implement an aggressive new integrated waste management program." (Pub. Resources Code, § 40000, subd. (d).) Thus, ". . . the responsibility for solid waste management is a shared responsibility between the state and local governments" (Pub. Resources Code, § 40001, subd. (a)) and ". . . it is in the public interest for the state . . . to authorize and require local agencies . . . to make adequate provision for solid waste handling . . . ." (Pub. Resources Code, § 40002.)

 Our review of this appeal is also strictly circumscribed by the long-established rule of according extraordinarily broad deference to the

---

[5]A general plan is a required statement of long-term development policies. (*DeVita* v. *County of Napa* (1995) 9 Cal.4th 763, 772-773 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) "The planning law . . . compels cities and counties to undergo the discipline of drafting a master plan to guide future local land use decisions." (*Id.* at p. 773.) The plan must include seven identified elements and must be " 'comprehensive [and] long[]term' . . . as well as 'internally consistent.' " (*Ibid.*)

electorate's power to enact laws by initiative. The state constitutional right of initiative or referendum is "one of the most precious rights of our democratic process." (*Mervynne v. Acker* (1961) 189 Cal.App.2d 558, 563 [11 Cal.Rptr. 340].) These powers are reserved to the people, not granted to them. Thus, it is our duty to " ' "jealously guard" ' " these powers and construe the relevant constitutional provisions liberally in favor of the people's right to exercise the powers of initiative and referendum. (*Rossi v. Brown* (1995) 9 Cal.4th 688, 695 [38 Cal.Rptr.2d 363, 889 P.2d 557].) An initiative measure " 'must be upheld unless [its] unconstitutionality clearly, positively, and unmistakably appears.' " (*Id.* at p. 711.) ▆▆ An initiative measure amending a general plan or zoning ordinance is valid "so long as reasonable minds might differ as to the necessity or propriety of the enactment . . . ." (*Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 292 [3 Cal.Rptr.2d 504], disapproved on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

Pala does not challenge these general principles. Pala instead asserts numerous specific arguments in an attempt to persuade us that Proposition C violates constitutional and statutory provisions. Pala argues Proposition C is invalid because it (1) proposes only indirect amendments to the General Plan and Zoning Ordinance; (2) is inconsistent with other portions of the General Plan; (3) violates Public Resources Code section 50000.5; (4) reflects administrative acts; (5) eliminates "essential" County functions; (6) fails to adequately inform the voters of the initiative provisions; (7) contains an invalid "tipping fee" provision; and (8) violates California Constitution, article II, section 12 by defining the applicant as "Servcon."

In the published portion of this opinion, we explain why we reject the first ("indirect amendment") argument and explain the basis of our conclusion that Section 8A violates the California Constitution but that Section 8A is severable and does not affect the validity of the remainder of the initiative. In the unpublished portion of the opinion, we reject Pala's additional contentions.

We emphasize that in addressing these issues, our role is limited to determining whether Proposition C, approved by San Diego County voters, violates any constitutional or statutory provisions. It is not our role, and we make no attempt, to judge the merits of the initiative.

## II. *Proposition C Is Not Invalid as "Indirect" Legislation*

Pala first argues Proposition C is constitutionally infirm because the initiative's "Implementation" section (section 7)[6] proposes only "indirect" amendments to the General Plan and Zoning Ordinance. Pala relies on *Marblehead* v. *City of San Clemente* (1991) 226 Cal.App.3d 1504 [277 Cal.Rptr. 550] (*Marblehead*).

*Marblehead* invalidated a local initiative measure that directed the San Clemente City Council to enact general plan amendments to reflect specified "*concepts*." (*Marblehead, supra,* 226 Cal.App.3d at p. 1510.) The San Clemente initiative provided that before any other general plan amendment could be approved, certain defined levels of transportation services and other city services must " 'be achieved and maintained.' " (*Id.* at p. 1507.) The initiative stated " '[u]pon the effective date of this initiative, the general plan of the City shall be deemed to be amended to contain these concepts and enforced as such by the City. . . . The City shall within six (6) months revise the text of the general plan and other ordinances to specifically reflect the provisions of this amendment and ordinance.' " (*Ibid.*)

*Marblehead* concluded this initiative was beyond the scope of the electorate's initiative power. Noting that the California Constitution limits the

---

[6]Section 7 reads:

"A. Amendments to County General Plan.

"Upon the effective date of this initiative, the land use element of the County General Plan and all sub-regional and community plans which apply to the Gregory Canyon site and any related maps shall be amended to designate the Gregory Canyon site Public/Semi-public lands with a Solid Waste Facility Designator. Notwithstanding the Public/Semi-public designation, the Gregory Canyon site shall remain private lands unless purchased or condemned by a public agency.

"B. Amendments to County Zoning Ordinance.

"Upon the effective date of this initiative, the County Zoning Ordinance shall be amended to create a new zoning classification designated Solid Waste Facility ("SWF"). This SWF zoning classification shall be applied only to the Gregory Canyon site and shall allow the Project without the need for any permits from the County of San Diego except the Water Course Alteration Permit, Bridge Permit, Grading Permit and Building permit.

"C. Amendments to Other County Ordinances and Policies.

"All other County ordinances, rules, and regulations which constitute legislative acts shall be amended as necessary to accommodate the Project as set forth in this initiative.

"D. County Cooperation.

"The County of San Diego shall cooperate with the Applicant wherever possible in issuing permits and approvals so that the Project can proceed in a timely fashion.

"The County of San Diego is hereby authorized and directed to amend other elements of the General Plan, sub-regional plans, community plans, Zoning Ordinance, and other ordinances and policies affected by this initiative as soon as possible and in the manner and time required by State Law to ensure consistency between this initiative and other elements of the County's General Plan, sub-regional and community plans, Zoning Ordinance and other County ordinances and policies."

initiative power to the enactment of "statutes" (*Marblehead, supra*, 226 Cal.App.3d at pp. 1508-1509; Cal. Const., art. II, § 8; see *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 707-716 [206 Cal.Rptr. 89, 686 P.2d 609]), the *Marblehead* court reasoned the initiative measure was invalid because it did "not directly amend San Clemente's general plan" and therefore it was not a "statute." (*Marblehead, supra*, 226 Cal.App.3d at p. 1510.) The court explained the initiative "constitutes a resolution by the voters declaring that the city's general plan should be revised to reflect the '*concepts*' expressed in the measure. The actual amendment of the general plan is left to the city council. Which elements of the general plan are affected and how the substantive terms of Measure E are to be incorporated into these elements is unexplained." (*Ibid.*) *Marblehead* stressed that the city council "could not simply append [the initiative] to the existing [general plan]" since a general plan must be a "consistent" and "integrated" document. (*Ibid.*)

 Relying on *Marblehead*, Pala argues each of the subsections of section 7 "are indirect legislation" and therefore they are "unconstitutional and must be stricken." We disagree. Proposition C's implementation section is not comparable to that found inadequate in *Marblehead*.

Unlike the conceptual directives underlying the *Marblehead* initiative, Section 7A amends the General Plan; it does not rely on future legislative action. This is accomplished by language directing that the land use element of the General Plan be changed to permit a previously impermissible land use (waste disposal) in a particular area (Gregory Canyon). Section 7A provides the land use element and all relevant community plans and maps "shall be amended to designate the Gregory Canyon site Public/Semi-public lands with a Solid Waste Facility Designator."[7] This is a proper amendment as it makes a specific change to a specific portion of the General Plan. Because the General Plan's land use element sets forth the county's intentions concerning the distribution, location and use of real property (Gov. Code, § 65302), this was the appropriate element to amend.

We reject Pala's argument that additional text was necessary to designate Gregory Canyon as a site for a solid waste facility. Respondents have presented portions of the General Plan reflecting that the Section 7A text is the appropriate method for amending the General Plan to allow a landfill to be developed and operated on the site. Under the General Plan, a "Public/

---

[7]The land use element of the General Plan provides "[t]he Solid Waste Facility Designator (SWF) may be applied on a case-by-case basis to areas of the (22) Public/Semi-Public Designation that contain existing solid waste facilities or sites proposed for that use. It is the intent of this designator that proposed and existing waste facility sites be protected from encroachment by development or incompatible uses."

Semi-public Lands with a Solid Waste Facility Designator" is a term of art and the label is all that is necessary to designate a waste disposal use on that land. Pala has not presented any authority to support its assertion that more is required.

Likewise, Section 7B specifically amends the Zoning Ordinance to create a new zoning classification applicable to the Gregory Canyon site. This is a proper amendment since it makes a specific change to the Zoning Ordinance. The fact that the initiative did not cite to the particular ordinance number where the amendment will be located does not invalidate the initiative. We are unaware of any authority requiring that an initiative specify the particular numerical section that will contain the proposed amendment.

While Sections 7C and 7D do not propose "direct" amendments to the laws or to the General Plan, *Marblehead* does not provide a basis for invalidating these sections. The proposed general plan amendments in *Marblehead* did not state how *any* specific element of the general plan would be changed. Rather, the San Clemente initiative required the city council to make amendments as necessary to promote land use "concepts" identified in the initiative. *Marblehead* stated the voters could not propose such unspecified amendments to the San Clemente general plan because such vague mandate is inconsistent with the purpose of a general plan, to serve as an " 'integrated, internally consistent and compatible statement of policies . . . .' " (*Marblehead, supra*, 226 Cal.App.3d at p. 1510; see Gov. Code, § 65300.5.)

Here, the voters said precisely how the General Plan is to be amended— Section 7A changes the land use element to designate the Gregory Canyon site for use as a solid waste facility. Sections 7C and 7D merely tell the County to enact any necessary amendments to ensure the General Plan amendment will take place. Such enabling legislation promotes, rather than violates, the requirement that a general plan reflect an integrated and consistent document. Further, on this record there is no basis to believe any amendment to the General Plan would be necessary since there is no evidence Proposition C creates an inconsistency in the plan.[8]

We additionally decline to read *American Federation of Labor* v. *Eu, supra*, 36 Cal.3d 687 as establishing a blanket rule that initiatives proposing

---

[8]Because there are no inconsistencies on the face of the plan, Pala's reliance on *Sierra Club* v. *Board of Supervisors* (1981) 126 Cal.App.3d 698 [179 Cal.Rptr. 261] is unavailing. In *Sierra Club*, the county adopted a land use element that was inconsistent with the general plan's open space element. (*Id.* at p. 703.) The county recognized the inconsistencies, but "[b]ecause of a lack of time" did not attempt to make the elements consistent and instead inserted a clause stating that the land use element would take precedence over other general plan elements. (*Ibid.*) The court held this " 'precedence clause' " was improper and could not

"indirect" legislation such as those identified in Sections 7C and 7D are necessarily beyond the scope of the electorate's power. *American Federation of Labor* concerned a proposed initiative mandating the California Legislature to apply to the United States Congress for a constitutional convention to adopt a balanced budget amendment. (36 Cal.3d at p. 707.) The California Supreme Court determined the balanced budget initiative "merely express[ed] the wishes of the enacting body" and therefore it was not a "statute" within the meaning of California Constitution article II, section 8. (36 Cal.3d at p. 708.) In so concluding, *American Federation of Labor* recognized the "distinction between an initiative which enacts a statute and one which commands the Legislature to do so . . . may be constitutionally significant." (*Id.* at p. 714.) The court, however, did not base its holding on that distinction. The court's holding was instead premised on its view that the initiative measure sought *only* to express the policy views of the voters: ". . . the crucial provisions of the balanced budget initiative do not adopt a *statute* or enact a law. They adopt, and mandate the Legislature to adopt, *a resolution* which does not change California law . . . ." (*Id.* at p. 694, original italics.)

Section 7C does not ask the board of supervisors to adopt a resolution—it tells the legislative body to enact any necessary *laws* to permit the "Project" to take effect. Section 7D likewise tells the legislative body to enact any needed General Plan or Zoning Ordinances to ensure consistency with the Sections 7A and 7B amendments. Neither *Marblehead* nor *American Federation of Labor* can fairly be read as prohibiting the voters from exercising such powers.[9]

We reject Pala's argument Proposition C was beyond the electorate's power because it failed to propose a "statute."[10]

---

be used to cure conflicts within a general plan. Here, unlike in *Sierra Club,* there is no evidence of an inconsistency or that section 7 requires the land use element to take "precedence" over the other elements.

[9]We note that California Constitution article I, section 28, subdivision (b), enacted by the voters in Proposition 8, contained an analogous provision that has never been challenged as beyond reach of the electorate's power. Article I, section 28 expresses the voters' intent that victims should recover restitution and then states "[t]he Legislature shall adopt provisions to implement this section during the calendar year following adoption of this section."

[10]For similar reasons, we also reject Pala's argument that the initiative is invalid because the County could not have enacted Sections 7C and 7D since these amendments are "prospective." We likewise reject Pala's argument that Proposition C is invalid because it "constrains" the County's ability to enact future legislation.

III.-VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IX. *"Servcon" as the "Applicant"*

California Constitution, article II, section 12 provides: "No amendment to the Constitution, and no statute proposed to the electors by the Legislature or by initiative, that names any individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect."[15] Pala contends Proposition C violates this constitutional provision because Section 8A defines Servcon as the "Applicant" and the initiative provides the applicant with "powers," "duties," and "functions" relating to the application process and to the operation of the solid waste facility.

Respondents counter that (1) article II, section 12 restricts only statewide initiatives and is inapplicable to a county initiative; (2) Proposition C does not violate article II, section 12 because the initiative does not identify Servcon to "perform any function" or "to have any power or duty"; and (3) even assuming Proposition C violates article II, section 12, the provision identifying Servcon is severable and this court should enforce the remaining provisions or rewrite the definition of "Applicant" to eliminate the reference to Servcon.

As explained below, we conclude article II, section 12 applies to Proposition C and that Section 8A violates the constitutional provision. We determine, however, that Section 8A is severable.

A. *Article II, section 12 applies to Proposition C*

Article II, section 12 applies to an "amendment to the Constitution" and a "*statute* proposed to the electors by the Legislature or by initiative." (Italics added.) ▮▮▮ Respondents argue that because a statute generally means a state law and an ordinance generally means a local law, article II, section 12's reference to a "statute" must mean a state law and therefore the constitutional provision applies only to statewide initiatives.

▮▮▮ In determining the meaning of a constitutional provision, we apply established principles of statutory construction. (*Mutual Life Ins. Co.* v. *City*

---

*See footnote 1, *ante*, page 565.
[15]All further article references are to the California Constitution.

*of Los Angeles* (1990) 50 Cal.3d 402, 407 [267 Cal.Rptr. 589, 787 P.2d 996].) Our primary objective is to ascertain the legislative intent. In so doing, we first examine the particular words used, keeping in mind that words should be interpreted in the context of the relevant constitutional provisions as a whole. (*Quintano* v. *Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1055 [48 Cal.Rptr.2d 1, 906 P.2d 1057]; *Schmidt* v. *Retirement Board* (1995) 37 Cal.App.4th 1204, 1210 [44 Cal.Rptr.2d 297].) If there is no ambiguity, the constitutional provision should be interpreted according to its plain meaning. (*Mutual Life Ins. Co.* v. *City of Los Angeles, supra,* 50 Cal.3d at p. 407.) Where an ambiguity exists, we may resort to extrinsic evidence to determine the intent of the Legislature or of the voters. (*Ibid.*)

 Applying these principles, we conclude the term "statute" as used in article II, section 12 does not reflect a legislative intent that the constitutional provision apply only to statewide initiatives.

First, the term "statute" does not unambiguously refer only to a state law. As reflected in the dictionary definitions, the commonly understood meaning of a "statute" broadly extends to "law[s] enacted by the legislative branch of a government," without limiting the definition to the laws of a particular legislative body. (See Webster's New Collegiate Dict. (9th ed. 1987) p. 1152.) While in legal terminology a statute generally means a state or federal law and an ordinance is used to specifically refer to a municipal or county law, a court must apply the "usual and ordinary" meaning of words, rather than a technical construction.

Second, the origin of article II, section 12 reveals the term "statute" was not selected for the purpose of limiting the scope of the constitutional provision to state initiatives. Article II, section 12 derived from two voter initiatives contained in former article IV, section 1d, a 1950 initiative and a 1964 initiative, both of which sought to prevent voters from "confer[ing] special privilege or advantage on specific persons or organizations." (*Cal-farm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 832 [258 Cal.Rptr. 161, 771 P.2d 1247].) Under the wording of the 1950 initiative, the prohibition against identifying individuals applied not to "statutes" but more broadly to a "*law . . . proposed by the initiative* or by the Legislature." (Former art. IV, § 1d, subd. (a).) The 1964 initiative concerned only proposed constitutional amendments. (Former art. IV, § 1d, subd. (b).) In combining the two provisions to create the present version of article II, section 12, the 1966 Constitution Revision Commission changed the word "laws" to "statutes," but stated it was not intending to change the meaning of the provision. (Cal. Const. Revision Com., Proposed Revision (Feb. 1966), at p. 50.)

Thus, respondents' insistence that the word "statute" was intended to impart a special meaning different than the word "law" or "ordinance" is not supported. We are further unpersuaded by respondents' focus on the fact that the 1950 and 1964 initiatives were triggered by perceived problems with particular *state* initiatives. We have examined the legislative history materials and have found nothing in those materials indicating that the voters believed these same problems would not exist with local initiatives or that the voters intended to exclude local initiatives from the reach of the restrictions. Further, respondents have failed to articulate, and we have been unable to identify, any policy basis for the voters to have intended a distinction between state and local initiatives with respect to the rule that initiatives may not identify individuals or entities.

Third, viewing article II, section 12 in combination with the other relevant constitutional provisions shows that the voters in 1950 and 1964 and the Constitution Revision Commission in 1966 would have understood that the article II, section 12 restriction would extend to local initiatives. When voters enact an initiative, they are "deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted." (*People* v. *Weidert* (1985) 39 Cal.3d 836, 844 [218 Cal.Rptr. 57, 705 P.2d 380].)

Article II, sections 8 and 9 create the statewide initiative and referendum powers.[16] Article II, section 11 extends these powers to voters in local elections.[17] The courts have long recognized that the rights of initiative and referendum reserved to local voters under article II, section 11 (and its predecessor provision) are co-extensive with the rights reserved to the people of the state as set forth in the state Constitution, unless a local charter gives the voters broader powers. (See *Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 609 [150 P. 977]; *Midway Orchards* v. *County of Butte* (1990) 220 Cal.App.3d 765, 777 [269 Cal.Rptr. 796]; *Dye* v. *Council of the City of Compton* (1947) 80 Cal.App.2d 486, 489 [182 P.2d 623]; see also *Rossi* v. *Brown, supra,* 9 Cal.4th at pp. 694-699; *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 836-837 [313 P.2d 545].) Thus, unless a charter extends the local initiative or referendum power, constitutional limitations on the statewide initiative and referendum powers generally apply to also

---

[16]Article II, section 8 provides "[t]he initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." Article II, section 9, subdivision (a) states "[t]he referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State."

[17]Section 11 provides "[i]nitiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide. This section does not affect a city having a charter."

restrict the power of local voters to vote on countywide initiatives. (See *Rossi* v. *Brown*, *supra*, 9 Cal.4th at p. 698; *Geiger* v. *Board of Supervisors*, *supra*, 48 Cal.2d at pp. 836-837; see also *Voters for Responsible Retirement* v. *Board of Supervisors* (1994) 8 Cal.4th 765, 778 [35 Cal.Rptr.2d 814, 884 P.2d 645].)

While the cases recognizing that the statewide limitations on the initiative and referendum power apply in local elections have arisen mostly in the context of limitations on the referendum power, the reasoning of these cases apply equally to the initiative power. (See *Ortiz* v. *Board of Supervisors* (1980) 107 Cal.App.3d 866, 870 fn. 3 [166 Cal.Rptr. 100].) At least one court has assumed that the single subject rule applicable to statewide initiatives applies equally to county initiatives. (See *San Mateo County Coastal Landowners' Assn.* v. *County of San Mateo* (1995) 38 Cal.App.4th 523, 553 [45 Cal.Rptr.2d 117].)[18] Likewise, respondents here concede the applicability of article II, section 8, subdivision (a)'s requirement that initiatives must enact "statutes," even though article II, section 8 pertains to the statewide initiative power. (See *American Federation of Labor* v. *Eu*, *supra*, 36 Cal.3d 687; *Marblehead*, *supra*, 226 Cal.App.3d 1504.)

 We thus presume the voters understood that when they approved the 1950 and 1964 propositions prohibiting naming of entities in initiatives, the proposed rules would apply equally to statewide *and* local initiatives, unless a local charter provided otherwise. Had these voters or the Constitution Revision Commission wanted a different rule, they could have said so. They did not.

The San Diego County Charter (County Charter) does not expand the local initiative power. Instead, the charter confirms that the county voter's initiative and referendum powers in county elections are equivalent to that of the state voter's powers. The charter provides "[t]he people of the County may exercise the initiative, referendum, and recall provisions of general law." (County Charter, art. II, § 200.) The charter defines "[g]eneral [l]aw" as "the *Constitution*, Statutes, and Codes of the State of California." (County Charter, art. I, § 100, italics added.) Thus, under the County Charter, county voters are bound by the same restrictions in enacting laws by initiatives as are applicable to state voters.

---

[18]*Ex parte Haskell* (1896) 112 Cal. 412, 421 [44 P. 725], relied upon by respondents is inapposite. *Haskell* held that a *different* constitutional provision, providing that a statute must "embrace but one subject, which shall be expressed in its title" (now contained in art. IV, § 9), does not apply to laws passed by a city. (112 Cal. at p. 421.) *Haskell* reasoned the extension of the constitutional provision to municipalities was not intended and would be impractical. *Haskell*'s reasoning has no applicability to article II, section 8's single-subject rule pertaining only to initiatives.

We reject Servcon's argument in its supplemental brief that County Charter, article II, section 200 is unconstitutional because it "enact[s] initiative provisions different from those contained in the general statutes of the State applicable to county initiatives and referenda." The charter merely makes the local initiative power equivalent to that of the statewide initiative power. Such rule is consistent with the state Constitution.[19]

Respondents additionally argue their interpretation of article II, section 12 as applying only to state statutes is supported by our Supreme Court's recent reference to article II, section 12 as a "limitation[] on the . . . statewide initiative power." (*Rossi* v. *Brown*, *supra*, 9 Cal.4th at p. 695.) Reading the quoted language in context, the Supreme Court did not state or suggest that article II, section 12 was inapplicable to the local initiative power.

Servcon further argues that if we were to hold that article II, section 12 applied to Proposition C, this would "severely curtail[]" the "long . . . recognized" power of the people to use *initiatives* to designate private parties as public franchises. Servcon cites to two cases holding that the granting of a franchise is subject to the *referendum* process. (See *Pacific Rock etc. Co.* v. *City of Upland* (1967) 67 Cal.2d 666, 668 [63 Cal.Rptr. 572, 433 P.2d 476]; *Orange County Cable Communications Co.* v. *City of San Clemente* (1976) 59 Cal.App.3d 165, 171 [130 Cal.Rptr. 429].) Article II, section 12 applies to initiatives, and not referendums. Respondents do not cite, nor are unaware of, authority in this state upholding a local electorate's right to use the initiative power to designate a private individual or corporation to act as a franchise. Thus, our conclusion does not place any new limits on an existing right.

We additionally reject Servcon's argument that holding article II, section 12 applicable to Proposition C would violate the general rule that the power of the voters by initiative and referendum is co-extensive with the legislative power of the governing body. (See *DeVita* v. *County of Napa*, *supra*, 9 Cal.4th at p. 775.) As our Supreme Court has recognized, article II, section 12 creates an exception to that general rule. (*Calfarm Ins. Co.* v. *Deukmejian*, *supra*, 48 Cal.3d at p. 835, fn. 29.) In striking a portion of Proposition 103 that would have established a private corporation to represent consumers, the court noted "Article II, section 12, limits only the power of the voters, not

---

[19]We likewise reject Servcon's argument that if we interpret the charter as making article II, section 12 applicable to county initiatives, we would also be required to construe the charter as requiring the county to be bound by state statutes pertaining to other levels of government, such as municipalities and school districts. The county charter's provision that the county voters may exercise the initiative powers of "general law" does not mean that the procedures specially applicable to other entities, such as municipalities or school districts, would apply to the county.

the Legislature. The Legislature remains free to adopt measures to provide for consumer representation . . . ." (*Id.* at p. 835, fn. 29.)

## B. *Does Proposition C violate article II, section 12?*

Respondents argue that even assuming article II, section 12 applies to Proposition C, Section 8A does not violate that constitutional provision because the initiative does not name or identify Servcon " 'to perform any function' " or " 'to have any power or duty.' " We disagree.

Most fundamentally, the express intent and purpose of the initiative is to authorize a "Project" to be constructed on the Gregory Canyon site after the necessary permits are obtained. Section 7C requires the County to amend all ordinances, rules and regulations "to accommodate the Project." Section 4, subdivision K "directs" the County "to include the Project in its Integrated Waste Management Plan . . . and to make any findings required for issuance of any necessary permits." The proposition defines the "Project" as a "recycling collection center and landfill and associated structures and improvements as described in Section 3 of this initiative measure *as subsequently modified by a detailed site plan submitted by Applicant* to the Integrated Waste Management Board as part of the solid waste facilities permit." (§ 8, subd. D, italics added; see also § 3, subd. A.) Thus, the proposition provides the applicant (defined as Servcon) with the sole responsibility of preparing and submitting the site plan that will ultimately define the precise nature of the project created by the proposition. This imposes functions, powers, and duties on Servcon within the meaning of article II, section 12.

Further, the initiative repeatedly states that the applicant "shall consult" with federal and state agencies and "shall secure" numerous specified permits and approvals required by state or federal law. (§ 4.) The proposition also recognizes the applicant will be the operator of the solid waste facility and imposes on the applicant numerous duties and powers related to the operation of the facility. (§ 5.) For example, the initiative states the applicant (1) "*shall* widen and realign State Route 76" (§ 5, subd. I, italics added); (2) "*shall* . . . implement[]" a landscaping plan prepared by a licensed architect (§ 5, subd. O, italics added); (3) "*shall* submit a mitigation and monitoring program meeting state and federal law to the Integrated Waste Management Board" (§ 5, subd. R, italics added); (4) "*shall* maintain trained, full-time personnel engaged exclusively and continuously in the inspection of incoming refuse loads for hazardous waste" (§ 5, subd. D, italics added); and (5) "*shall* retain a qualified archaeologist to investigate and recommend appropriate mitigation measures" and "*shall*" implement these mitigation measures (§ 5, subd. P, italics added).

Respondents argue that Proposition C does not vest Servcon with a function, power, or duty, but rather it merely identifies a land use designation and permits Servcon to "apply" to perform a function. As set forth above, Proposition C does much more than that. The initiative specifies functions and duties that Servcon must perform in operating the facility and gives Servcon the exclusive authority to prepare a site plan, apply to operate, and operate the project.

Respondents alternatively argue we should interpret article II, section 12 to mean that an initiative may not identify an entity to perform any "new" functions, powers, or duties. Respondents point out that as the "owner" of the property, Servcon already had the ability to apply for the necessary permits and to operate the facility. In response to the petition below, Servcon submitted the declaration of a Servcon project manager, stating that "[o]n July 23, 1993, North San Diego Development Company, . . . entered into a written agreement with Servcon granting Servcon the exclusive right to develop a landfill on . . . the 'Gregory Canyon site'. . . . Pursuant to this agreement, Servcon has sole ownership rights to develop a landfill and acquire the property."

Even assuming the word "new" should be read into article II, section 12, Proposition C gave Servcon functions and powers it did not have before the voters approved the initiative. Before Proposition C, Servcon apparently had the exclusive *contractual* right to develop and operate the solid waste facility at Gregory Canyon. Proposition C elevates that contractual right to a right under a county ordinance. In practical terms, it means that the current owner of the property is now bound by local law to follow through with that contract and, should a third party attempt to claim a superior right, Servcon would have the ability to rely on the terms of Proposition C to establish its exclusive right.[20] Servcon's contractual rights are not identical to the powers, duties, and functions accorded it in the initiative. Thus, Servcon's contractual rights do not exempt it from the reach of article II, section 12.

### C. *Are the provisions severable?*

When an initiative provision is invalid, the void provision must be stricken but the remaining provisions should be given effect if the invalid provision is severable. (*Gerken* v. *Fair Political Practices Com.* (1993) 6

[20]At oral argument Servcon's counsel suggested that Servcon's rights under Proposition C as the "Applicant" were not personal and instead "ran with the land." Counsel, however, failed to cite any authority supporting this rule in the factual context presented here. Further, we do not believe such rule affects our analysis on the specific issue as to whether Proposition C identifies Servcon to perform a function or to have any power or duty.

Cal.4th 707, 721 [25 Cal.Rptr.2d 449, 863 P.2d 694]; *California Gillnetters Assn.* v. *Department of Fish & Game* (1995) 39 Cal.App.4th 1145, 1158 [46 Cal.Rptr.2d 338].) Where, as here, the initiative contains a severability clause, the invalid provision is severable if it can be separated grammatically, functionally, and volitionally. (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at pp. 821, 836.) This rule applies to an initiative provision held invalid under article II, section 12. (48 Cal.3d at p. 836.)[21]

The volitional requirement concerns whether the voters would have adopted the initiative without the invalid provisions. (*Gerken* v. *Fair Political Practices Com., supra,* 6 Cal.4th at pp. 714-715; *California Gillnetters Assn.* v. *Department of Fish & Game, supra,* 39 Cal.App.4th at p. 1159.) " 'The test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions.' " (*Gerken* v. *Fair Political Practices Com., supra,* 6 Cal.4th at pp. 714-715, italics deleted.) In applying this test, "[w]e may examine the proposition itself, as well as the ballot materials . . . ." (*California Gillnetters Assn.* v. *Department of Fish & Game, supra,* 39 Cal.App.4th at p. 1159.)

Other than naming "Servcon," the initiative text did not describe any facts about Servcon, such as identifying the nature of Servcon's business or that Servcon had development rights to the proposed landfill, nor were the voters given such information in the ballot materials. Likewise, neither the county counsel's impartial analysis nor the ballot arguments discussed or even mentioned Servcon. Further, there is no showing that the identification of Servcon as the operator of the proposed facility was part of the public debate about the merits of the initiative. On this record, the voters' decision to site a solid waste facility at Gregory Canyon could not have been motivated by the fact that Servcon was identified as the proposed operator of the facility. The volitional test is thus satisfied.

The next question is whether Section 8A is functionally and grammatically severable. We conclude that it is.

---

[21]*Calfarm* held a consumer-advocacy provision of Proposition 103 (concerning automobile insurance) violated article II, section 12, but that the provision was severable from the remainder of the initiative. In so holding, the court noted that article II, section 12 "precludes severability only within the confines of the particular statute which impermissibly names or identifies a person or private corporation." (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at p. 836.) The court went on to apply the three-part test to determine whether the invalid provision was severable from other statutes enacted by the proposition. We reject Pala's argument that *Calfarm* established a blanket rule against severing an invalid provision from a statute of which it is part.

Section 8A is contained in a discrete separate section and therefore it is grammatically severable.

Section 8A is also functionally severable because the proposition specifically imposes functions, powers, and duties on the "Applicant," not Servcon. Although striking Section 8A will leave the identity of the applicant and the term "Applicant" undefined, a textual definition of applicant is unnecessary to support the validity of the remainder of the initiative. Without an express definition, "Applicant" as set forth in Proposition C necessarily means the "proposed operator of the facility" or the "operator of the facility," depending on the particular section of the initiative. By definition, only the proposed operator of the private facility is entitled to apply to operate the facility and only the owner or operator of the facility would be required to engage in the mitigation measures.

Section 3, subdivision A (Section 3A), for example, states "[t]he Applicant shall be entitled . . . to alter the proposed facilities based on a detailed site plan to be submitted to the Integrated Waste Management Board . . . as part of the solid waste facilities permit." The California Code of Regulations states that the entity entitled to apply for such solid waste facilities permit is an "Applicant" defined as "the proposed operator of a facility." (Cal. Code Regs., tit. 14, § 18011, subd. (a)(3).) Thus, the applicant referred to in Section 3A means "the proposed operator of the facility." It is unnecessary to set forth that definition in the text of the initiative for the initiative to make sense. The deletion of Servcon as the "Applicant" will not alter the implementation of the initiative.[22]

Because Section 8A is grammatically, functionally, and volitionally severable from the remainder of Proposition C, the balance of the initiative remains valid. (See *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at pp. 821, 836.)

## X. *Additional Argument**

. . . . . . . . . . . . . . . . . . . . . . . .

[22]We note that in practical terms, our conclusion will not necessarily change the fact that Servcon will be responsible for performing the functions of the "Applicant." This result derives from the fact that a private property owner ultimately has the right to select the entity that may apply to operate, and operate, a business on its property. We further stress that nothing in this opinion is intended to impact Servcon's contractual rights or obligations as they relate to the Gregory Canyon site or the operation of the solid waste facility.

*See footnote 1, *ante*, page 565.

## DISPOSITION

We affirm the judgment, except that we conclude Section 8A is void and must be stricken from the initiative. Each party to bear its own costs.

Benke, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 9, 1997.

APPENDIX

## COUNTY OF SAN DIEGO
## Proposition C

(This proposition will appear on the ballot in the following form.)

---

**PROP C** GREGORY CANYON LANDFILL AND RECYCLING COLLECTION CENTER ORDINANCE. Shall the Gregory Canyon Landfill and Recycling Center Initiative Ordinance be adopted?

---

## NORTH COUNTY RECYCLING AND SOLID WASTE DISPOSAL INITIATIVE

The People of San Diego County Do Hereby Ordain as Follows:

SECTION 1. INTENT.

It is the intent of this initiative measure:

A. To provide for the siting of a new recycling collection center and class III solid waste landfill to allow the residents and businesses in northern San Diego County to dispose of their solid waste in an environmentally sound and economically competitive manner.

B. To ensure that the recycling collection center and landfill are designed, constructed, and operated in a safe and efficient manner by requiring that they fully comply with all environmental laws and regulations. The Project will be monitored during its life on a regular basis by regulatory agencies including, but not limited to, the Integrated Waste Management Board, the San Diego County Air Pollution Control District and the Regional Water Quality Control Board.

C. To amend the General Plan, Zoning Ordinance and other ordinances and policies of the County of San Diego to allow the construction and operation of a recycling collection center and class III solid waste landfill on approximately 270 acres of land within the 1683 acre Gregory Canyon site located off State Route 76 approximately 3 1/2 miles east of the intersection of Interstate 15 and State Route 76 in San Diego County. The general location of the Gregory Canyon site is shown on Figure 1 attached to this measure.

D. To provide that at least 1313 acres of the Gregory Canyon site will be dedicated as permanent open space to create a substantial preservation area for sensitive habitat and species.

SECTION 2. FINDINGS AND PURPOSE.

A. The San Marcos landfill is the only remaining landfill serving northern San Diego County which includes the cities of Carlsbad, Encinitas, Del Mar, Solana Beach, Escondido, Oceanside, San Marcos and Vista, and the unincorporated areas of northern San Diego County including Pauma, Bonsall, Valley Center, and Fallbrook.

B. The 1986 San Diego County Regional Solid Waste Management Plan and studies performed by the County of San Diego have documented the critical need for new solid waste facilities to serve the growing north San Diego County population.

C. The County of San Diego has been unsuccessful in siting any landfills in northern San Diego County since the San Marcos landfill was approved in 1977. This has occurred as a result of local opposition and the County of San Diego not proceeding with acceptable sites which have been extensively studied.

D. The conditional use permit issued in 1992 by the City of San Marcos for expansion of the San Marcos landfill requires the County of San Diego to aggressively pursue alternative north county landfill sites, and will expire by or before the year 1999, unless the City of San Marcos agrees to extend the term of the permit.

E. Local opposition to landfill sites and disagreement between north county cities and the County of San Diego over the handling of the solid waste system has created a solid waste crisis involving disputes between the cities and the County of San Diego.

PR-1200-3 SD 000-000

F. The Gregory Canyon site was selected as one of three preferred landfill sites by the County of San Diego based upon a 1987 study which evaluated 168 alternative sites in northern San Diego County covering a study area of 1150 square miles. Subsequently, one of these sites, .Blue Canyon, was dropped by the County of San Diego and two new landfill sites have been added. The Gregory Canyon site is now one of four finalist sites.

G. In 1990 the County of San Diego prepared an environmental impact report evaluating the environmental impacts of operating a landfill at the Gregory Canyon site. This Environmental Impact Report concluded that a landfill could be operated at the Gregory Canyon site consistent with all federal and state regulations governing landfill operations.

H. All of the San Diego County landfills have been successfully operated by a private party for the County of San Diego since 1982.

I. The Gregory Canyon site is located in a sparsely populated area of San Diego County. Solid waste operations will occur on approximately 270 acres of the Gregory Canyon site. At least 1313 acres will be dedicated as permanent open space to provide an important habitat and sensitive species preserve.

J. The voters hereby find and determine that the project will be compatible with other uses in the area and the County's general plan for uses in the area upon implementation of the mitigation measures required by this measure.

K. The voters hereby reaffirm the policy of the County of San Diego that each sub-region of the County shall be responsible for providing sufficient solid waste facilities to handle the solid waste generated in each sub-region and solid waste shall not be shipped from one sub-region to any other sub-region except where an emergency exists.

## SECTION 3. DESCRIPTION OF THE PROJECT.

The Project will include the following components:

### A. General Description of the Project.

The recycling collection center and landfill will occupy approximately 270 acres of the Gregory Canyon site. The landfill footprint containing refuse will cover approximately 150 acres of the site. The main features of the Project include a lined landfill, construction of a new access road and bridge providing access to the site from Highway 76, a scale area, a recycling collection center, a facilities and operation area, a borrow and stockpile area, a leachate collection system, and storm-water retention facilities. The facilities and operation area will include a visitors' center, an office building, a maintenance office, a shop and yard, a fueling station/storage area, a water tank truck wash and wash-water treatment area, a water supply well, groundwater monitoring wells, a landfill gas collection and recovery system, and a leachate collection tank. The Applicant shall be entitled to adjust the size and location of solid waste operations and to alter the proposed facilities based on a detailed site plan to be submitted to the Integrated Waste Management Board for its review and approval as part of the solid waste facilities permit.

### B. Dedicated Open Space.

The remaining 1413 acres of Gregory Canyon site shall be dedicated as permanent open space to the County of San Diego, the Pala Band of Mission Indians, another public agency, or a Resource Conservation Group for long-term preservation of sensitive habitat and species. The actual amount of acreage dedicated may be adjusted as necessary to accommodate construction and operation of the Project. The open space area shall not be less than 1313 acres as a result of any adjustment.

### C. Access Road.

The Project includes construction of a new access route and bridge from Highway 76 to the Gregory Canyon site.

### D. Relocation of San Diego Gas & Electric Power Lines.

The project includes relocation of San Diego Gas & Electric transmission lines that are located within the area for the proposed landfill and recycling collection center. All such relocation will occur in accordance with plans reviewed and approved by San Diego Gas & Electric.

E. Realignment of Highway 76.

The Project includes the widening and realignment of State Road 76 on either side of the new access road to improve sight distance and to facilitate truck movements. The realigned segment would provide approximately 1000 feet of sight distance in both directions for traffic leaving the landfill. The Applicant shall contribute on a fair share basis to the widening of State Route 76 west of the access road to applicable state standards. The fair share shall be based upon the state standard average daily trips. This realigned portion of Highway 76 will be restriped to provide for acceleration/deceleration lanes and an over-take lane for through traffic. Detailed plans for the realignment of Highway 76 will be submitted to CalTrans for review and approval prior to commencing any realignment work.

F. Bridge.

The Project will include a bridge over the San Luis Rey River to provide separate roadways for access to and from the landfill, and to and from the topsoil stockpile area. This will facilitate adequate internal circulation for the landfill operations.

G. Protection of San Diego Aqueduct.

The Project will include work required to protect any San Diego Aqueduct pipelines to the extent and in the manner required by the San Diego County Water Authority.

A map showing the Project elements is shown on Figure 2 attached to this measure. The Applicant shall be entitled to alter or change these elements based upon a detailed site plan to be submitted to the Integrated Waste Management Board for review and approval in conjunction with the solid waste facilities permit.

SECTION 4. PERMITS.

To ensure that the Project is designed, constructed and operated in a safe and efficient manner, the Project shall be required to secure all of the following permits and approvals to the extent required by state or federal law:

A. Environmental Review.

The Project shall complete any additional environmental review required by federal or state law to secure the remaining permits and approvals.

B. Consultation with Advisory Council on Historic Preservation.

The Applicant shall consult with the Advisory Council on Historic Preservation in accordance with §106 of the National Historic Preservation Act.

C. 404 Permit.

The Applicant shall secure a permit relating to §404 of the Clean Water Act from the Department of the Army Corps of Engineers.

D. U.S.Fish & Wildlife Service.

The Applicant shall conduct a §7 consultation with the Department of Interior, U.S.Fish & Wildlife Service in compliance with the Endangered Species Act and shall coordinate the §404 permit with the U.S.Fish & Wildlife Service as required by federal law.

E. California Department of Fish and Game.

The Applicant shall secure a §1601 Streambed Alteration Agreement with the California Department of Fish & Game and any other permits required by the California Department of Fish & Game.

F. State Water Resources Control Board.

The Applicant shall secure a National Pollutant Discharge Elimination System Permit from the State Water Resources Control Board.

G. Regional Water Quality Control Board.

The Applicant shall secure a Waste Discharge Permit from the Regional Water Quality Control Board.

H. California Integrated Waste Management Board.

The Applicant shall obtain a Solid Waste Facility Permit from the California Integrated Waste Management Board and from the local enforcement agency for the California Integrated Waste Management Board.

I. California Department of Transportation.

The Applicant shall secure an encroachment permit from the California Department of Transportation as necessary for improvements to Highway 76.

J. State Office of Historic Preservation.

The Applicant shall review cultural sites within the Gregory Canyon site with the State Office of Historic Preservation for eligibility for the National Register of Historic Places.

K. County of San Diego.

The Applicant shall secure a Water Course Alteration Permit, Bridge Permit, Grading Permit and Building Permit from the County of San Diego. The County of San Diego is hereby authorized and directed to include the Project in its Integrated Waste Management Plan as required by State law and to make any findings required for issuance of any necessary permits.

L. San Diego Air Pollution Control District.

The Applicant shall secure all permits required by the San Diego Air Pollution Control District to construct and operate the solid waste facilities authorized by this measure.

M. San Diego Local Agency Formation Commission.

The Applicant shall obtain approval from the San Diego Local Agency Formation Commission for any possible annexation into local water districts as required by the rules and regulations of the San Diego Local Agency Formation Commission.

N. Utilities Services.

The Project shall comply with the requirements of local utility suppliers in securing electric, telephone, water and fire protection services. Sewer service will be provided by chemical toilets used by workers at the landfill. The Applicant will be required to provide the sewage disposal service, removing effluent once per week by pumper truck from the chemical toilets for treatment and disposal away from the site.

O. Other Permits and Approvals.

The Applicant shall secure all other permits and approvals as required by federal or state law.

SECTION 5. MITIGATION MEASURES.

To ensure that the Project is constructed and operated in a manner which minimizes its environmental impacts, the following mitigation measures are hereby adopted as a condition of voter approval of the Project:

A. Days of Operation.

The solid waste facilities shall remain open for the receipt of refuse a minimum of eight (8) hours a day, six (6) days a week, excepting those holidays observed by county-owned landfills.

B. Hours of Operation.

Solid waste operation shall occur only between the hours of 7:00 AM and 6:00 PM, Monday through Friday, and 8:00 AM to 5:00 PM on Saturday unless different hours are established by the Integrated Waste Management Board. For the purposes of this mitigation measure "solid waste operations" shall include the receipt, handling, processing, and/or disposal of solid waste or recyclable materials; cover operations; site grading and/or excavation, including blasting and rock crushing; and heavy equipment operation. Other site activities such as the operation of gas and leachate collection and treatment systems, remedial activities required by a regulatory agency, maintenance within the maintenance yard, and activities conducted in a completely enclosed building shall not be limited to these hours of operation.

**C. Litter and Illegal Dumping.**

At least five (5) days each week, the Applicant shall inspect for, and clean up, all litter and illegal dumping which occurs on, or adjacent to, the landfill access road and that portion of Highway 76 between the intersection with Interstate 15 and the site. The clean up team shall consist of at least one truck with a minimum crew of two persons.

**D. Hazardous Waste Exclusion Program.**

The Applicant shall maintain trained, full-time personnel engaged exclusively and continuously in the inspection of incoming refuse loads for hazardous waste. These personnel shall be stationed at the working face of the landfill whenever the landfill is open to accept waste and shall inspect loads as they are tipped. Hazardous wastes encountered in this fashion shall be handled and disposed of in accordance with state regulations.

**E. Liner and Leachate Collection System.**

A liner and leachate collection system shall be installed and monitored as required by the Regional Water Quality Control Board.

**F. Landfill Gas System. ·**

The Project shall include a network of vertical extraction wells, lateral transmission pipes to a gas recovery facility, and perimeter gas monitoring probes. With this system, the landfill gas will be extracted from the landfill and combusted in an enclosed flare.

**G. Water Quality.**

The Project shall comply with all requirements of the Regional Water Quality Control Board to ensure protection of surface and underground water quality.

**H. Earthquakes.**

All structures located at the Gregory Canyon site shall be designed by a qualified engineer to withstand the maximum probable earthquake to avoid potential impacts associated with earthquakes and ground shaking.

**I. Traffic Impacts.**

In order to mitigate traffic impacts, the Applicant shall widen and realign State Route 76 on either side of the access road to improve sight distance and to facilitate truck movements. The realigned segment will provide approximately 1000 feet of sight distance in both directions for traffic leaving the landfill. The Applicant shall contribute on a fair share basis to the widening of State Route 76 west of the access road to applicable state standards. The fair share shall be based upon the state standard average daily trips. Striping will be provided for acceleration/deceleration lanes and an over-take lane for through traffic. These realignment plans may be modified as necessary to meet CalTrans requirements.

**J. Air Quality.**

Air quality impacts associated with the Project shall be mitigated by meeting all requirements imposed by the San Diego County Air Pollution Control District for the Authority to Construct and Authority to Operate permits.

**K. Noise Abatement.**

The Applicant shall prepare a Noise Abatement Plan to include:

1. Physical design provisions to ensure that ambient noise levels do not exceed 65 CNEL at the boundaries of the Gregory Canyon site;
2. Installation of landfill equipment and vehicles with noise suppressing equipment to assist in meeting the above restrictions;
3. Provisions for at least 24 hour in advance written notice of any blasting on-site to residents within a one-mile radius of the blast site.
4. Where ambient noise levels exceed 65 CNEL at the boundaries of the Gregory Canyon site, the Applicant shall retain a qualified noise expert to evaluate the problem and recommend mitigation measures. These mitigation measures shall be implemented by the Applicant.

L. Odor Control.

To control odors on-site, the Applicant shall submit an Odor Control Plan to the San Diego County Air Pollution Control District for review and approval.

M. Dust Control Plan.

To control dust from Project operations, the Applicant shall submit a Dust Control Plan to the San Diego County Air Pollution Control District for review and approval.

N. Biological Impacts.

All sensitive species and habitat impacted by the Project shall be mitigated in accordance with requirements imposed by the United States Fish & Wildlife Service as part of the §7 consultation.

O. Visual Impacts.

In order to mitigate visual impacts associated with the Project, the Applicant shall employ extensive use of landscaping emphasizing native vegetation, and rounding/undulation of slopes on the refuse column and changes in slope angles. All landscaping shall be performed by a licensed landscape architect in the State of California. This licensed architect shall prepare a detailed landscape plan designed to minimize visual impact associated with the Project to the maximum feasible extent. The plan prepared the licensed architect shall be implemented by the Applicant upon completion.

P. Cultural Impacts.

Impacts to Native American resources impacted by the Project shall be mitigated through the development of a Memorandum of Agreement between the Applicant and the appropriate regulatory agencies in accordance with §106 of the National Historic Preservation Act. To mitigate archaeological impacts caused by the Project, the Applicant shall retain a qualified archaeologist to investigate and recommend appropriate mitigation measures. These mitigation measures shall be implemented by the Applicant.

Q. Citizen Environmental Review Board.

A Citizen Environmental Review Board (the "Board") shall be established by agreement between the Applicant and the cities or other governmental entities agreeing to supply waste to the Project. The members of such Board shall be appointed by each such city or entity and shall be individual citizens who are not employees or officials of such city or entity. The Board shall have the authority to inspect and review all reports submitted by the Project to any other regulatory agency and to make recommendations to any such regulatory agency with respect to the operation of the Project, including any enforcement actions the Board may deem appropriate. The Board shall establish an environmental review team consisting of qualified personnel to monitor the operations of the landfill which team shall have reasonable access to the landfill during all hours of operation of the landfill.

R. Additional Mitigation Measures.

Mitigation measures included as part of any subsequent environmental review of the Project shall be included as additional mitigation measures for the Project. The Applicant shall submit a mitigation and monitoring program meeting state and federal law to the Integrated Waste Management Board for review and approval as part of the solid waste facilities permit.

SECTION 6. TIPPING FEE AND FINANCIAL GUARANTEES.

A. Tipping Fee.

It is the intention of the voters to ensure that the tipping fee charged by the Project to any public agency supplying waste to the project does not exceed the tipping fee currently charged at county-owned landfills as adjusted for inflation. This fee is currently $43 per ton. For calendar year 1994, this tipping fee shall be $43 per ton. Commencing January 1, 1994, and continuing on January 1 of each year thereafter, this tipping fee may be increased by the percentage charge in the Consumer's Price Index, All Urban Consumer's for the Los Angeles - Anaheim - Riverside Area (1967 = 100) for December of the prior year to December of the year the price increase is to occur.

PR-1200-8 SD 000-000

The tipping fee as set in this section shall be subject to changes or adjustments based upon tipping fees negotiated between the Applicant and various public agencies agreeing to provide solid waste to the Project.

B. Financial Guarantees.

The Applicant shall provide a closure and post-closure plan complying with federal and state law and shall provide bonds or other financial guarantees to ensure performance as required by federal and state law.

## SECTION 7. IMPLEMENTATION.

A. Amendments to County General Plan.

Upon the effective date of this initiative, the land use element of the County General Plan and all sub-regional and community plans which apply to the Gregory Canyon site and any related maps shall be amended to designate the Gregory Canyon site Public/Semi-public lands with a Solid Waste Facility Designator. Notwithstanding the Public/Semi-public designation, the Gregory Canyon site shall remain private lands unless purchased or condemned by a public agency.

B. Amendments to County Zoning Ordinance.

Upon the effective date of this initiative, the County Zoning Ordinance shall be amended to create a new zoning classification designated Solid Waste Facility ("SWF"). This SWF zoning classification shall be applied only to the Gregory Canyon site and shall allow the Project without the need for any permits from the County of San Diego except the Water Course Alteration Permit, Bridge Permit, Grading Permit and Building Permit.

C. Amendments to Other County Ordinances and Policies.

All other County ordinances, rules and regulations which constitute legislative acts shall be amended as necessary to accommodate the Project as set forth in this initiative.

D. County Cooperation.

The County of San Diego shall cooperate with the Applicant wherever possible in issuing permits and approvals so that the Project can proceed in a timely fashion.

The County of San Diego is hereby authorized and directed to amend other elements of the General Plan, sub-regional plans, community plans, Zoning Ordinance, and other ordinances and policies affected by this initiative as soon as possible and in the manner and time required by State Law to ensure consistency between this initiative and other elements of the County's General Plan, sub-regional and community plans, Zoning Ordinance and other County ordinances and policies.

## SECTION 8. DEFINITIONS.

For the purpose of this measure, the following words and phrases shall have the following meanings:

A. "Applicant" shall mean Servcon-San Marcos, Inc. or its assignee or authorized representatives.

B. "Gregory Canyon site" shall mean the approximately 1683 acres of land located off State Route 76 approximately 3 1/2 miles east of the intersection of Interstate 15 and State Route 76 occupying portions of Sections 4 and 5 of Township 10 South and Sections 32 and 33 of Township 9 South Range 2 West of the San Bernardino Principle Meridian.

C. "Integrated Waste Management Board" shall mean the State of California Integrated Waste Management Board.

D. "Project" shall mean the recycling collection center and landfill and associated structures and improvements as described in Section 3 of this initiative measure as subsequently modified by a detailed site plan submitted by Applicant to the Integrated Waste Management Board as part of the solid waste facilities permit.

E. "Recycling collection center" shall mean a facility for the buy-back of source separated materials but not the processing of mixed waste.

### SECTION 9. PURCHASE BY PUBLIC AGENCY.

The Gregory Canyon site shall remain private land until purchased by a public agency or Joint Powers Authority for its fair market value. Nothing contained herein shall restrict the right of any public agency to exercise its eminent domain power as authorized by law to acquire the Gregory Canyon site.

### SECTION 10. AMENDMENT OR REPEAL.

This measure may be amended or repealed only by a majority of the voters voting in an election thereon.

### SECTION 11. INTERPRETATION AND SEVERABILITY.

This measure shall be interpreted so as to be consistent with all federal and state laws, rules and regulations. If any section, sub-section, sentence, clause, phrase, part or portion of this measure is held to be invalid or unconstitutional by a final judgment of court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this measure. The voters hereby declare that this measure, and each section, sub-section, sentence, clause, phrase, part or portion thereof would have adopted or passed irrespective of the fact that any one or more sections, sub-sections, sentences, clauses, phrases, parts or portions are declared invalid or unconstitutional.

### SECTION 12. CONSISTENCY WITH OTHER BALLOT MEASURES.

In the event that another ballot measure is placed on the same ballot as this measure purporting to deal with the same subject matter, and if both measures should pass, the voters expressly declare their intent that both measures shall be put into effect except to the extent that specific provisions of such measures are in direct conflict. In the event of such a direct conflict, the measure which obtained more votes will control as to the conflicting provisions only. The voters expressly declare this to be their intent, notwithstanding any language to the contrary in any other ballot measure.

PR-1200-11

SD 000-000

SCALE

N

SOURCE: BMA, 1989.

Proposed North County Landfill

FIGURE 1

Butler Roach Group

SD 000-000