Filed 3/9/26

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| ALAMEDA COUNTY TAXPAYERS' ASSOCIATION, INC., et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF OAKLAND,<br><br>    Defendant and Respondent;<br><br>CONSERVATION SOCIETY OF CALIFORNIA, INC.,<br><br>    Real Party in Interest and Respondent. | A171041<br><br>(Alameda County<br>Super. Ct. No. 23CV028069) |

Plaintiffs Alameda County Taxpayers' Association, Inc. and Marcus Crawley (collectively, the Association) appeal after the trial court entered judgment against them in their action seeking to invalidate an Oakland initiative measure (Measure Y) that provides funding for the Oakland Zoo. The zoo is owned by the City of Oakland (the City) and managed by the Conservation Society of California, Inc. (the Conservation Society) pursuant to a management agreement with the City.

The Association contends that, because Measure Y allegedly benefits the Conservation Society, the measure violates article II, section 12 of the

California Constitution,[1] a provision that states an initiative may not "name[] or identif[y] any private corporation to perform any function or to have any power or duty." The Association also argues that Measure Y, which received 63.1 percent of the vote, required a two-thirds supermajority to pass.

We conclude certain provisions of Measure Y violate article II, section 12, but can be severed. Specifically, Measure Y confers functions and duties on the "Zoo Operator" and identifies the Conservation Society as currently filling that role. But after severing the references to the Conservation Society, Measure Y remains valid. As to the Association's second argument, we conclude Measure Y required only a simple majority to pass. We will affirm the trial court's judgment, as modified to reflect our conclusion as to severance.

## I. BACKGROUND

### A. *Measure Y*

Measure Y, an initiative measure to amend the Oakland Municipal Code, appeared on the ballot for Oakland voters for the November 2022 general election. In a July 2022 resolution directing that the measure be placed on the ballot, the Oakland City Council stated the city clerk had certified that the petition proposing the amendment had been signed by the requisite number of registered voters. Measure Y proposed a parcel tax of $68 per year for single-family parcels (with varying amounts for other parcels) for 20 years, beginning on July 1, 2023, to raise about $12 million per year to fund the operations of the Oakland Zoo.

As noted, the Oakland Zoo is owned by the City and managed by the Conservation Society pursuant to a management agreement. The current

---

[1] Undesignated article references are to the California Constitution.

2

management agreement expires on October 31, 2039.  The contract can be terminated by mutual consent or for an uncured breach of a material provision of the contract.

Under Measure Y, the amounts collected through the parcel tax are to be placed in a special fund in the City treasury and then distributed to the "Zoo Operator" (i.e., the operator of the zoo, which the measure states is currently the Conservation Society) to be used for the authorized purposes listed in the measure.  Measure Y states it will take effect if it is approved by a majority of voters.

At the November 2022 election, Measure Y received 63.1 percent support, with 77,769 votes in favor and 45,529 votes against.  The Oakland City Council passed a resolution in December 2022 stating Measure Y had received a majority of votes at the election and had passed.

## B. *Procedural Background*

In February 2023, the Association filed the present reverse validation action seeking to invalidate Measure Y and requesting declaratory and injunctive relief.  The Association filed the operative second amended complaint (SAC) in October 2023.  In relevant part, the SAC asserts (1) Measure Y is invalid because it violates article II, section 12 (first and second causes of action), and (2) Measure Y was not validly enacted because it required approval by a two-thirds supermajority of voters (third through sixth causes of action).[2]

The City and the Conservation Society demurred to the claims pertaining to an alleged supermajority requirement.  The trial court

_____

[2] The SAC also challenges the validity of certain tax increase provisions in Measure Y (seventh and eighth causes of action).  On appeal, the Association raises no challenge to the trial court's dismissal of these claims.

sustained the demurrers without leave to amend, concluding Measure Y required only a simple majority to pass.

The City and the Conservation Society later moved for judgment on the pleadings as to the remaining claims in the SAC (first, second, seventh, and eighth causes of action). The court granted the motion without leave to amend. The court found in part that Measure Y's references to the Conservation Society did not violate article II, section 12, and that even if they did, the references were severable and the rest of Measure Y would remain valid.

The court entered judgment, and the Association appealed.

## II. DISCUSSION

### A. *Standard of Review*

"We review a trial court's ruling on demurrer de novo [citation], giving ' "the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context." ' " (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 847.) We "treat the demurrer as admitting all material facts properly pleaded that are not inconsistent with other allegations, exhibits, or judicially noticed facts[,]" but "[w]e need not accept as true . . . deductions, contentions or conclusions of law or fact." (*Morris v. JPMorgan Chase Bank, N.A.* (2022) 78 Cal.App.5th 279, 292.)

" ' "A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review." ' " (*City of Rancho Palos Verdes v. State of California* (2025) 114 Cal.App.5th 13, 23.) "Like a general demurrer, a motion for judgment on the pleadings tests the sufficiency of the complaint to state a cause of action. [Citation.] 'The court must assume the truth of all factual allegations in the complaint, along with matters subject to judicial notice.' " (*Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1337.)

4

We review the trial court's denial of leave to amend for abuse of discretion.  (*Morris v. JPMorgan Chase Bank, N.A., supra,* 78 Cal.App.5th at p. 292 [demurrer]; *Rancho Palos Verdes v. State of California, supra,* 114 Cal.App.5th at p. 23 [motion for judgment on the pleadings].)  The plaintiff may establish an abuse of discretion by showing there is a reasonable possibility the defect in the complaint could be cured by amendment.  (*Morris*, at p. 292; *Rancho Palos Verdes,* at p. 23.)

## B. *Article II, Section 12*

Article II, section 12 states:  "No amendment to the Constitution, and no statute proposed to the electors by the Legislature or by initiative, that names any individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect."[3]  The provision was "enacted to prevent the initiative [power] from being used to confer special privilege or advantage on specific persons or organizations."  (*Calfarm*, *supra*, 48 Cal.3d at p. 832.)

The Association contends Measure Y violates article II, section 12 by conferring responsibilities and benefits on a private corporation, the Conservation Society.  In response, the City[4] argues (1) Measure Y does not violate article II, section 12, and (2) alternatively, any problematic provisions of the measure can be severed.  As we explain below, we conclude certain provisions of Measure Y that identify the Conservation Society as the current "Zoo Operator" (a role that involves functions and duties

---

[3] This prohibition applies to both local and statewide initiatives (*Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565, 580 (*Pala Band*)) and to both for-profit and nonprofit corporations (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 833–834 (*Calfarm*)).

[4] The Conservation Society has joined in the City's appellate brief.

5

assigned by the measure) violate article II, section 12, but we conclude those provisions are severable and do not invalidate the remainder of Measure Y.

In addressing the parties' arguments on these points, we bear in mind that an initiative measure "must be upheld unless [its] unconstitutionality clearly, positively, and unmistakably appears." (*Legislature v. Eu* (1991) 54 Cal.3d 492, 501; accord, *Calfarm*, *supra*, 48 Cal.3d at p. 815 ["If the validity of the measure is 'fairly debatable,' it must be sustained."].) When a part of an initiative violates article II, section 12 but is severable, "the rule is clear: the offending part must be stricken from the initiative, and the remainder may take effect." (*Calfarm*, at p. 836.)

### 1. Measure Y's References to the Conservation Society

Measure Y amended the Oakland Municipal Code by adding chapter 4.58 (§§ 4.58.010 through 4.58.130) to title 4 of that code. (Measure Y, § 2; Oakland Muni. Code, ch. 4.58.) The measure imposes a parcel tax (in specified amounts for different types of properties) (see Oakland Muni. Code, § 4.58.080) and directs that the collected funds be used for specific purposes related to the operation and maintenance of the Oakland Zoo. (*Id.*, §§ 4.58.060, 4.58.050, subd. (C).) The amounts collected by the City are to be deposited into one or more special funds in the City treasury (*id.*, § 4.58.050, subd. (A)) and then distributed to the "[Z]oo [O]perator" to be used for the authorized "purposes and uses" (*id.*, § 4.58.050, subd. (B)) listed in Measure Y.

Relevant to the parties' arguments in this appeal, Measure Y provides definitions of certain terms, including (1) " 'Oakland Zoo' " (or " 'Zoo' ") and (2) " 'Zoo Operator.' " (Oakland Muni. Code, § 4.58.030, subds. (A), (D).) Under Measure Y, " 'Oakland Zoo' or 'Zoo' means the zoological park known as the Oakland Zoo, owned by the City of Oakland and located in Knowland Park, currently managed by the Conservation Society of California, a

6

California nonprofit corporation." (*Id.*, § 4.58.030, subd. (A).) And as to the zoo operator, the measure states: " 'Zoo Operator' means the operator of the Oakland Zoo. The Conservation Society of California is currently the [Z]oo [O]perator pursuant to a management agreement with the City of Oakland." (*Id.*, § 4.58.030, subd. (D).)

In our view, Measure Y imposes functions, powers, and duties on the Conservation Society within the meaning of article II, section 12. Under Measure Y, the Zoo Operator (which the measure states is currently the Conservation Society) will receive funds produced by the new parcel tax and is to use them "for the purposes and uses" identified in Measure Y. (Oakland Muni. Code, § 4.58.050, subd. (B);[5] see *id.*, § 4.58.030, subd. (D).) The initiative also requires the Zoo Operator to "comply with" several requirements "as a condition of receiving monies from the Oakland Zoo Fund," including that it must (1) retain an independent auditor to prepare an annual report that "includes the amounts collected and expended from the proceeds of the parcel tax and the status of any project required or authorized to be funded," (2) maintain the Zoo's accreditation, and (3) indemnify the City for claims "arising out of the administration of this parcel tax, the Oakland Zoo Fund, and this Chapter." (Oakland Muni. Code, § 4.58.070, subd. (B).)

---

[5] Oakland Municipal Code section 4.58.050, subdivision (B) states: "Funds in the Oakland Zoo Fund [i.e., the funds collected by the City through the parcel tax imposed by Measure Y] shall be distributed to the [Z]oo [O]perator for the purposes and uses listed herein as they are deposited into the fund, after deducting amounts necessary to pay the fees charged by the County of Alameda to collect and remit the special tax." (Oakland Muni. Code, § 4.58.050, subd. (B); see *id.*, §§ 4.58.050, subds. (A) [defining " 'Oakland Zoo Fund' "], (C) [permissible uses of collected funds], 4.58.060 [same].)

Under these provisions, the Conservation Society (during the time when it is the Zoo Operator) is to perform the function of spending the parcel tax revenue for authorized purposes, and it has specified duties associated with that function. (Oakland Muni. Code, §§ 4.58.050, subd. (B), 4.58.070, subd. (B).) Measure Y thus assigns functions and duties to the Conservation Society within the meaning of article II, section 12. (*Calfarm, supra,* 48 Cal.3d at p. 832 [initiative provision that required the formation of a corporation to perform the " 'function' " of " 'advocat[ing] the interests of insurance consumers in any forum' " was invalid under art. II, § 12]; *Pala Band, supra,* 54 Cal.App.4th at pp. 584–585 [initiative provided the "applicant" (defined as a particular corporation, Servcon) had the responsibility to prepare and submit a site plan for a solid waste facility, was obligated to consult with federal and state agencies, and had numerous duties and powers related to the operation of the facility; the initiative "impose[d] functions, powers, and duties on Servcon within the meaning of article II, section 12"].)[6]

The City argues Measure Y "confers no function, power, or duty on the Conservation Society specifically" and "merely notes the Conservation Society is the present Zoo Operator." We cannot agree. In *Pala Band,* which we think is soundly reasoned, an appellate panel found a violation of article II, section 12 where the measure at issue imposed duties on the "applicant" and defined that term to mean Servcon, a private corporation. (*Pala Band, supra,* 54 Cal.App.4th at pp. 584–585.) Similarly, here, we conclude the provisions of Measure Y that identify the Conservation Society

[6] The courts in both *Calfarm* and *Pala Band* found the problematic portions of the initiatives at issue could be severed, leaving the remainder intact. (*Calfarm, supra,* 48 Cal.3d at pp. 835–837; *Pala Band, supra,* 54 Cal.App.4th at pp. 585–587.)

as the current Zoo Operator violate article II, section 12, because the measure assigns functions, powers, and duties to the Zoo Operator.

The City emphasizes Measure Y does not itself dictate that the Conservation Society will always be the Zoo Operator. The Conservation Society serves as the Zoo Operator pursuant to a management agreement with the City, an agreement that (1) is set to expire a few years before all Measure Y funds will have been collected (i.e., the agreement expires in October 2039, while the Measure Y parcel tax will expire in July 2043), and (2) potentially could be terminated even before the contractual end date.

But in our view, the fact the Conservation Society may not permanently occupy the role of Zoo Operator does not eliminate the article II, section 12 problem. As discussed above, Measure Y contains provisions that expressly "identif[y]" (art. II, § 12) the Conservation Society as the current Zoo Operator, a role that comes with assigned functions and duties. And we disagree with the City's suggestion that the Conservation Society's preexisting contractual arrangement with the City should be viewed as the sole source of its rights and duties in connection with the Zoo. As discussed, Measure Y requires the Zoo Operator to perform certain functions and duties relating specifically to the funds derived from the new parcel tax. (See *Pala Band*, *supra*, 54 Cal.App.4th at p. 585 [initiative "elevate[d] [corporation's] contractual right to a right under a county ordinance"].)

The cases cited by the City on this point are distinguishable, as the initiatives in those cases either (1) did not name or identify a specific corporation, or (2) did not assign any functions, powers or duties. In *Hernandez v. Town of Apple Valley* (2017) 7 Cal.App.5th 194, 196, an initiative provided for amendments to a town's general plan to allow for a

9

commercial development, which would include a Walmart Supercenter. The initiative did not name or identify Walmart. (*Id.* at p. 211.) Instead, it "use[d] words including 'developer' and 'owner.' " (*Ibid.*) The appellate court rejected an article II, section 12 challenge to the initiative, stating in part: "As a practical matter, as in [*Pala Band*], Walmart as the owner and developer of the property would be responsible for the acts under the Initiative. However, since Walmart could sell the property, it would have no superior right over the subsequent owner or developer of the property." (*Hernandez,* at p. 211.) The initiative did not assign the power to develop the property "to Walmart only." (*Id.* at p. 213.)

Similarly, in *Pala Band, supra,* 54 Cal.App.4th 565, the initiative amended the county general plan and the county zoning ordinance to designate an area for use as a privately owned solid waste facility. (*Id.* at p. 570.) The initiative imposed functions, powers, and duties on "the 'Applicant' " (*id.* at p. 587), including requiring the applicant to submit a site plan, consult with federal and state agencies, and perform duties related to the operation of the facility (*id.* at p. 584). Unlike the initiative in *Hernandez*, the initiative in *Pala Band* contained a provision defining the applicant as a particular private corporation, Servcon. (*Id.* at pp. 572, 584.) The appellate court held that provision violated article II, section 12 (*Pala Band*, at pp. 584–585), but after severing the provision, the remainder of the initiative was valid (*id.* at pp. 586–587). The *Pala Band* court noted that, "in practical terms, our conclusion will not necessarily change the fact that Servcon will be responsible for performing the functions of the 'Applicant.' " (*Id.* at p. 587, fn. 22.)

Here, in contrast to the initiative in *Hernandez* and the as-severed initiative in *Pala Band*, Measure Y specifies in section 4.58.030,

subdivision (D) that the Conservation Society is the current Zoo Operator. (Oakland Muni. Code, § 4.58.030, subd. (D) [Conservation Society "is currently the [Z]oo [O]perator pursuant to a management agreement with the City of Oakland"]; see *id.*, subd. (A) [Zoo is "currently managed by the Conservation Society of California, a California nonprofit corporation"].)

While *Hernandez* involved an initiative that did not name or identify a private corporation, the recent decision in *County of Alameda v. Alameda County Taxpayers' Assn., Inc.* (2024) 99 Cal.App.5th 226 (*County of Alameda*) (also cited by the City) involved an initiative that did name a corporation but did not assign it any functions, powers, or duties. In *County of Alameda*, voters approved an initiative to fund early childhood education and pediatric health care in the county. (*Id.* at p. 229.) A hospital was named in the measure's findings, which "describe[d] it as a critical provider of pediatric care in the community without assigning it any function, power, or duty." (*Id.* at p. 237.) The appellate court held, "[s]imply naming a specific private corporation does not violate article II, section 12." (*Ibid.*)

A separate provision in the initiative in *County of Alameda* that imposed a duty on the county's board of supervisors to consult with the hospital did not obligate *the hospital* to do anything, and this "passive consultation role" did not run afoul of article II, section 12. (*County of Alameda, supra,* 99 Cal.App.5th at p. 237.) Finally, a provision allowing the board to use some of the measure's revenue to support the services the hospital provided to the community did not violate article II, section 12. (*County of Alameda,* at p. 238, fn. 7.) The appellate court stated: "This potential, nonexclusive benefit to the hospital . . . does not appear to be a duty, power, or function proscribed by article II, section 12." (*Ibid.*) As we have discussed, Measure Y (in contrast to the initiative at issue in *County of*

11

*Alameda*) does assign functions, powers, and duties to the Zoo Operator, which the measure states is currently the Conservation Society.[7]

### 2. Severability

Section 4.58.100 of the Oakland Municipal Code (enacted as part of Measure Y) provides as follows:

---

[7] In so concluding, we wish to make clear that we are not embracing the entirety of the Association's article II, section 12 challenge to Measure Y. The Supreme Court in *Calfarm* explained that article II, section 12 was "enacted to prevent the initiative [power] from being used to confer special privilege or advantage on specific persons or organizations." (*Calfarm*, *supra*, 48 Cal.3d at p. 832.) Relying on this language, the Association suggests the Zoo Operator's receipt of the parcel tax funds (to use for the purposes authorized by Measure Y) should be viewed as a "special privilege or advantage" that independently violates article II, section 12, without regard to whether the measure assigns the Zoo Operator a function, power, or duty. We reject this argument as an over-reading of *Calfarm*. *Calfarm* did not hold or suggest that an initiative is unconstitutional because it allegedly benefits a private entity, nor that a court may depart from the constitutional text and find a violation when an initiative does not assign the private entity a function, power, or duty. (See *Calfarm*, *supra*, 48 Cal.3d at p. 832 [finding initiative provision violated art. II, § 12, where the corporation at issue was "identified to perform a 'function' "].)

Other courts have included the "special privilege or advantage" language in their article II, section 12 analysis, but not as a basis to find a violation where the initiative did not assign a function, power, or duty. (*Tain v. State Bd. of Chiropractic Examiners* (2005) 130 Cal.App.4th 609, 633 [stating initiative "did *not* violate [art. II, § 12], in that it did *not* confer a special privilege or advantage on" the Council on Chiropractic Education (CCE); initiative "also does not give the CCE any duties" (italics added)]; *County of Alameda, supra,* 99 Cal.App.5th at p. 237 [suggesting "special privilege or advantage" is an *additional* requirement; "The question is whether Measure C violates article II, section 12 by granting a specific 'name[d] or identifie[d]' private corporation a function, power, or duty that gives it a special privilege or advantage."].)

12

"If any provision of this Chapter, or section, phrase or word thereof, or the applicability of any provision, section, part, phrase or word to any person or circumstances, including any exemption to the parcel tax or defined term, is for any reason held to be invalid or unconstitutional, the remaining provisions, sections, parts, phrases or words shall not be affected, but shall remain in full force and effect, and to this end the provisions, sections, parts, phrases and words of this Chapter are severable. [¶] The voters hereby declare that this Chapter, and each section, provision, part, phrase and word, including any exemption to the parcel tax or defined term, would have been adopted irrespective, of whether any one (1) or more provisions, sections, parts, phrases or words are found to be invalid or unconstitutional. . . ."

"The presence of such a clause establishes a presumption in favor of severance." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 270.) "When an initiative provision is invalid, the void provision must be stricken but the remaining provisions should be given effect if the invalid provision is severable. [Citations.] Where, as here, the initiative contains a severability clause, the invalid provision is severable if it can be separated grammatically, functionally, and volitionally. [Citation.] This rule applies to an initiative provision held invalid under article II, section 12." (*Pala Band*, *supra*, 54 Cal.App.4th at pp. 585–586.)

"Grammatical separability, also known as mechanical separability, depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains. [Citations.] Functional separability depends on whether 'the remainder of the statute " 'is complete in itself . . . .' " ' [Citation.] Volitional separability depends on whether the remainder ' "would have been adopted by the legislative body

had the latter foreseen the partial invalidation of the statute." ' "
(*California Redevelopment Assn. v. Matosantos, supra,* 53 Cal.4th at p. 271.)

Measure Y contains three references to the Conservation Society—the definition of " 'Zoo Operator' " states the Conservation Society is currently the Zoo Operator (Oakland Muni. Code, § 4.58.030, subd. (D));[8] the definition of " 'Oakland Zoo' or 'Zoo' " mentions the Zoo is "currently managed" by the Conservation Society (*id.,* § 4.58.030, subd. (A));[9] and a provision addressing a potential future change in management refers to the Conservation Society (*id.,* § 4.58.070, subd. (F)).[10] We conclude that the Association fails to overcome the presumption of severability, whether we look at the issue presented here as one of grammatical separability, functional separability, or volitional separability.

First, we agree with the trial court and the City that the references in Measure Y to the Conservation Society (the italicized portions of the above

---

[8] Section 4.58.030, subdivision (D) states: " 'Zoo Operator' means the operator of the Oakland Zoo. *The Conservation Society of California is currently the [Z]oo [O]perator pursuant to a management agreement with the City of Oakland.*" (Italics added.)

[9] Section 4.58.030, subdivision (A) provides: " 'Oakland Zoo' or 'Zoo' means the zoological park known as the Oakland Zoo, owned by the City of Oakland and located in Knowland Park*, currently managed by the Conservation Society of California, a California nonprofit corporation.*" (Italics added.)

[10] Section 4.58.070, subdivision (F) states: "In the event that *the Conservation Society of California ceases to operate the Oakland Zoo or* the City of Oakland contracts with another entity for the operation of the [Z]oo, the City shall inform the City Administrator regarding the new operator selected prior to entering into a new management agreement. Any new management agreement shall be consistent with the accountability measures specified herein, and shall be a prerequisite to the successor operator being eligible to receive parcel tax proceeds." (Italics added.)

14

quotations) are grammatically separable.  The references appear in discrete sentences or clauses within specific provisions of Measure Y (specifically, § 4.58.030, subds. (A) and (D), and § 4.58.070, subd. (F)), and those provisions remain coherent without the severed portions.  We reject the Association's suggestion that the standard of grammatical coherence can only be met where an entire provision is severed.

Second, the references to the Conservation Society are functionally separable.  Deletion of those references will not affect the collection of Measure Y's parcel tax or the use of the collected funds for authorized purposes by the Zoo Operator (whether that position is occupied by the Conservation Society or a different entity).  In short, severance "will not alter the implementation of the initiative." (*Pala Band*, *supra*, 54 Cal.App.4th at p. 587.)

In connection with its arguments as to both grammatical and functional severability (and to some extent volitional severability, which we discuss below), the Association contends severance of Measure Y's references to the Conservation Society is insufficient because the measure provides funds to the Zoo Operator, a role that is currently filled by the Conservation Society.  We disagree.  The fact an initiative contemplates a role for a private entity does not violate article II, section 12 unless the initiative "names or identifies" (art. II, § 12) a particular corporation to fill the role.  (*Hernandez v. Town of Apple Valley, supra,* 7 Cal.App.5th at p. 211 [initiative valid where it referred to " 'developer' " and " 'owner' " but did not name or identify the current property owner]; *Pala Band*, *supra*, 54 Cal.App.4th at p. 587 & fn. 22 [initiative that "impose[d] functions, powers, and duties on the 'Applicant,' not Servcon" was valid after severing a provision defining applicant as Servcon].)

15

Third, as to the final severability test, the references to the Conservation Society are volitionally separable. In the case of a voter initiative, "[t]he volitional requirement concerns whether the voters would have adopted the initiative without the invalid provisions. [Citations.] ' "The test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." ' [Citation.] In applying this test, '[w]e may examine the proposition itself, as well as the ballot materials . . . .' " (*Pala Band*, *supra*, 54 Cal.App.4th at p. 586.)

We agree with the trial court that removing the references to the Conservation Society as the current operator of the zoo would not have made a difference to a reasonable voter deciding whether to vote for Measure Y. As the court noted, "[T]he role of the operator was fungible for purposes of a reasonable voter evaluating the measure—the identity of the operator made no difference to the arguments for or against the measure." Indeed, the arguments for and against Measure Y in the November 2022 ballot materials do not mention the Conservation Society. There is no showing the Conservation Society's identity as the operator was "part of the public debate about the merits of the initiative." (*Pala Band*, *supra*, 54 Cal.App.4th at p. 586.)

The Association notes that, in the "Rebuttal to Argument in Favor of Measure Y" in the ballot materials, opponents of the measure criticized the involvement of a "private corporation" in the management of the zoo. The argument stated in part, "The Oakland Zoo is managed by a private corporation. Our taxes must not be given to a private corporation with no strings attached." But as the trial court noted, "the critique was generic to

16

corporations; it did not concern the Conservation Society specifically (e.g., by arguing that the zoo was being mis-managed or that there was some problem with the Conservation Society as opposed to other potential operators)."

The Association argues references to the "Oakland Zoo" in the initiative or in the ballot materials must be read as references to the Conservation Society. We disagree. Measure Y defines the " 'Oakland Zoo' " as the zoological park itself. (§ 4.58.030, subd. (A).) And even without that express definition, most voters would likely understand the term that way. The Association notes that, in 2021, the Conservation Society filed a fictitious business name statement stating it does business as the Oakland Zoo.

We are unconvinced. We reject the Association's suggestion that this filing somehow precluded future use of the term to refer to the physical zoo.[11] The references to the "Oakland Zoo" in Measure Y and in the related ballot arguments do not violate article II, section 12, and do not affect the severability analysis.

### 3. Leave to Amend

The Association has not shown it can amend the SAC to cure the deficiencies in its claims under article II, section 12. The Association states it would add allegations about a distribution agreement and a management agreement, but we have concluded the Conservation Society's role in

---

[11] *Pinkerton's, Inc. v. Superior Court* (1996) 49 Cal.App.4th 1342, cited by the Association, does not stand for any such notion. *Pinkerton's* notes a corporation's "[u]se of a fictitious business name does not create a separate legal entity." (*Id.* at p. 1348.) This principle does not affect our conclusion that the term "Oakland Zoo" (as used and defined in Measure Y) would be understood by voters to mean the physical zoo.

17

managing the zoo and allocating the parcel tax revenue does not violate article II, section 12, and the proposed allegations would not alter our decision on that point. The Association also suggests it could add allegations about mailers from the "Yes on Y" campaign that refer to the Conservation Society as doing business as "The Oakland Zoo," but for the reasons discussed above, we do not find the "dba" issue significant for purposes of the article II, section 12 analysis. None of the proposed allegations would show that Measure Y (after severance of specific portions as we have outlined) is unconstitutional. The trial court did not abuse its discretion by denying leave to amend.[12]

## C. *Alleged Supermajority Requirements*

The Association contends the tax imposed by Measure Y violates constitutional and statutory provisions—specifically, Proposition 13 (art. XIII A, § 4), Proposition 218 (art. XIII C, § 2, subd. (d)), and Government Code section 50077—because it did not obtain a two-thirds majority of the votes at the November 2022 election. We review de novo the trial court's interpretation of these constitutional and statutory provisions. (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934.) "[W]e resolve doubts about the scope of the initiative power in its favor whenever possible [citation], and we narrowly construe provisions that

---

[12] The Association also asserts briefly that the trial court should not have granted judgment on the pleadings as to the Association's claims under article II, section 12, because there are "contested material factual issues" that would be developed through discovery. We are not persuaded there is any dispute that would affect resolution of the legal question whether Measure Y "names or identifies" a private corporation (art. II, § 12). (See *Tain v. State Bd. of Chiropractic Examiners, supra,* 130 Cal.App.4th at p. 633 [because language of initiative did not violate art. II, § 12, "[n]o trial is necessary or appropriate"].)

would burden or limit the exercise of that power [citation]." (*Id.* at p. 936.) Applying these principles here, we hold Measure Y required only a simple majority to pass.

## 1. Constitutional Provisions

Beginning with the constitutional provisions, Proposition 13 added article XIII A, section 4, which states in relevant part: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district . . . ." Proposition 218 added article XIII C, section 2, subdivision (d), which provides (as relevant here): "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote."[13]

Our Supreme Court has held related provisions of Propositions 13 and 218 apply to taxes imposed by local government (or the state legislature) but not to taxes imposed by voter initiative. (*California Cannabis Coalition v. City of Upland*, *supra*, 3 Cal.5th at pp. 931, 936; *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 248–249, 251, 253.) The *California Cannabis* court stated a "contrary conclusion would require an unreasonably broad construction of the term 'local government' at the expense of the people's constitutional right to direct democracy, undermining our longstanding and consistent view that courts should protect and liberally construe it." (*California Cannabis Coalition*, at p. 931.)

After *California Cannabis Coalition*, "the California appellate courts have uniformly concluded that the supermajority requirements applicable to

---

[13] "A special tax is one that earmarks or dedicates its proceeds to a specific purpose." (*County of Alameda, supra,* 99 Cal.App.5th at p. 233, fn. 4.) It is undisputed the tax authorized by Measure Y is a special tax.

19

special taxes imposed by local government (art. XIII A, § 4; art. XIII C, § 2, subd. (d)) do not limit the electorate's initiative power." (*County of Alameda*, *supra*, 99 Cal.App.5th at p. 233 [collecting cases].) Specifically, as this Division has affirmed, "the supermajority vote requirements of article XIII A, section 4 and article XIII C, section 2(d) constrain only local government entities such as the board of supervisors, and do not displace the people's power to enact initiatives by majority vote." (*City and County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058, 1070 (*Proposition G*), citing *City and County of San Francisco v. All Persons Interested in Matter of Proposition C* (2020) 51 Cal.App.5th 703, 721, 724 (*Proposition C*).) Accordingly, "if a local special tax is imposed via citizens' initiative, only a simple majority vote is required to adopt it." (*County of Alameda*, at p. 234.)

The Association does not dispute this principle. But the Association contends on appeal (and alleges broadly in the SAC) that Measure Y is not a bona fide citizens' initiative, because local government entities were involved in, or controlled, the campaign in favor of Measure Y. As a result, the Association asserts, Measure Y should be deemed a " 'government-sponsored measure' " requiring approval by a two-thirds majority. According to the Association, the SAC includes (or can be amended to include) sufficient allegations to sustain this theory.[14]

---

[14] The SAC does not allege the involvement of any particular government officials in the Measure Y campaign. It alleges "local government essentially controlled" the campaign; the measure had "too much government involvement"; the initiative (on information and belief) was "drafted, developed, vetted, qualified, orchestrated and/or otherwise supported using local government resources"; and it "was a negotiated, sponsored, supported, and/or promoted local government-sponsored initiative."

We reject this argument. A government official's or entity's support for, or involvement in, a citizens' initiative does not transform it into a local government measure requiring approval by a two-thirds majority. (*County of Alameda*, *supra*, 99 Cal.App.5th at pp. 234–236 [tax measure was passed by citizens' initiative; appellate court stated in part that it would be inconsistent with separation of powers principles for a court to declare "that a county's board of supervisors enacted a specific tax measure that, in fact, it never voted to enact"]; *Proposition G, supra,* 66 Cal.App.5th at pp. 1080–1082 [finding "nothing inherently sinister" about the fact a school district and a teachers' union supported a citizens' initiative imposing a parcel tax to benefit public schools]; *Howard Jarvis Taxpayers Assn. v. City and County of San Francisco* (2021) 60 Cal.App.5th 227, 239–242 (*Howard Jarvis*).)

The Association insists the present case falls within an exception to this principle, but the cases on which it relies—*Alliance San Diego v. City of San Diego* (2023) 94 Cal.App.5th 419 (*Alliance I*) and *Alliance San Diego v. California Taxpayers Action Network* (2025) 114 Cal.App.5th 1121 (*Alliance II*) (which reconsidered the portion of *Alliance I* invoked by the Association)—do not support the Association's position.

In the 2023 decision in *Alliance I, supra,* 94 Cal.App.5th 419 (which forms the basis of the Association's argument in its opening brief in this appeal), our colleagues in the Fourth District, Division One suggested "too much government involvement can mean an initiative is really presented by the local government." (*Id*. at p. 448.) On this point, the *Alliance I* court cited *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 10–11, a case that considered whether a specially formed taxing agency was really a special district whose tax impositions would require a two-thirds majority vote.

21

(*Alliance I*, at p. 448.)  In *Rider*, the court identified factors that may be relevant to determining whether a "new tax agency is *essentially controlled by*" a city or county that otherwise would have to comply with Proposition 13's supermajority requirement; such control would support an inference the agency was created with the intent to circumvent Proposition 13.  (*Rider*, at pp. 11–12.)  In *Alliance I*, the court suggested that, under *Rider*, "a government official's involvement must demonstrate substantial control for an initiative to be deemed a government action rather than a citizens' initiative."  (*Alliance I*, at p. 448.)  The appellate court in *Alliance I* directed the trial court to consider this issue on remand. (*Ibid.*)

In *County of Alameda*, *supra*, 99 Cal.App.5th 226 (decided in 2024), our colleagues in Division Five of this court reached a different conclusion as to the applicability of *Rider* and the relevance of alleged government involvement in an initiative.  In *County of Alameda*, the Association (the same party that challenges Measure Y in the present case) sought to invalidate a citizens' tax initiative that funded early childhood education and pediatric healthcare in Alameda County.  (*County of Alameda*, at p. 229.)  The Association alleged that, due to the involvement of a county supervisor and her chief of staff, the measure "was merely a ' "quasi-initiative" ' masquerading as a voters' initiative."  (*Id.* at p. 234.)  The Association "ask[ed] [the court] to declare that, when an initiative campaign is 'effectively controlled' by local government in ' "intentional circumvention" ' of Propositions 13 and 218, the tax was enacted by local government, not by voter initiative, and thus subject to the two-thirds vote requirement."  (*County of Alameda*, at p. 234.)

The appellate court in *County of Alameda* rejected this argument, declining to "ignore [the] reality" that the measure at issue "*was* enacted by voter initiative, not by the [county board of supervisors]." (*County of Alameda*, *supra*, 99 Cal.App.5th at p. 234.) It would be inconsistent with separation of powers principles for a court to declare "that a county's board of supervisors enacted a specific tax measure that, in fact, it never voted to enact." (*Ibid.*) And, relevant to the Association's argument in the present appeal, Division Five concluded that the California Supreme Court's decision in *Rider* (which, as noted, pertained to special districts) (*Rider v. County of San Diego*, *supra*, 1 Cal.4th at pp. 10–11) was inapposite because *Rider* had "nothing to do with initiatives." (*County of Alameda*, at p. 235.)

As outlined in *County of Alameda*, "[t]he *Rider* court recognized that [an earlier California Supreme Court case] had created a loophole, revisited the issue [citation], and concluded that the 'framers of Proposition 13, and the voters who adopted it' intended a broader definition of 'special district.' " (*County of Alameda*, *supra*, 99 Cal.App.5th at p. 235.) *Rider*'s holding as to special districts, however, is inapposite in the initiative context. Proposition 13 expressly applies to special districts, but "courts have uniformly concluded that the language and intent of Propositions 13 and 218 do not apply to voter initiatives." (*County of Alameda*, at p. 235.) And, specifically, " 'neither the text nor ballot materials provide the requisite "unambiguous indication" that the enactors of Propositions 13 and 218 intended to constrain the initiative power when an official is involved in the initiative process.' " (*County of Alameda*, at p. 235.)

After concluding *Rider* was inapplicable, the *County of Alameda* court stated: "We acknowledge that our colleagues in the Fourth District, citing *Rider*, recently suggested that 'too much government involvement' could

23

potentially 'convert a voter [tax] initiative into a local government initiative.' ([*Alliance I*], *supra*, 94 Cal.App.5th at pp. 447–448.) For the reasons stated above, we disagree." (*County of Alameda*, *supra*, 99 Cal.App.5th at p. 236.)[15]

More recently, in its October 2025 decision in *Alliance II*, *supra*, 114 Cal.App.5th 1121 (a later appeal arising from the same trial court proceeding that produced *Alliance I*), the Fourth District, Division One concluded the initiative at issue there was a "bona fide citizens' initiative." (*Id.* at p. 1141.)[16] The *Alliance II* court stated: "For the simple majority vote requirement to apply to a measure imposing a special tax, that measure must qualify as a bona fide citizens' initiative." (*Id.* at p. 1143.) But the court noted (as it had done in *Alliance I*) that a government official's involvement, without more, does not convert a voter initiative into a local government initiative. (*Alliance II*, at p. 1143, citing *Alliance I*, at p. 448.) The *Alliance II* court then discussed the case law addressing "whether a tax initiative qualifies as a citizens' initiative rather than a government-sponsored measure" (*id.* at p. 1143), including *Proposition G, supra,* 66 Cal.App.5th at pages 1080–1082, *Howard Jarvis, supra,* 60 Cal.App.5th at pages 239–242, and *County of Alameda, supra,* 99 Cal.App.5th at pages 230, 234. (*Alliance II*, at pp. 1143–1144.)

---

[15] *County of Alameda* was decided in January 2024. But in its May 2025 opening brief in this appeal, the Association presents an extended discussion of *Alliance I* without mentioning that *County of Alameda* disagreed with it on this point.

[16] *Alliance II* was filed after the Association filed its opening brief in this appeal (and after the City filed its appellate brief) but before the Association filed its reply brief.

24

Turning to *Rider* and its " 'substantial control' factors" (*Alliance II*, *supra*, 114 Cal.App.5th at p. 1148), the *Alliance II* court discussed the *Rider* decision, the brief reference to *Rider* in *Alliance I*, and *County of Alameda*'s more recent analysis of *Rider*.  (*Alliance II*, at pp. 1144–1146.)  The *Alliance II* court concluded *Rider* did not apply in the initiative context and rejected a claim that the alleged involvement of public officials in the initiative campaign there provided a basis to impose a two-thirds supermajority requirement.  (*Alliance II*, at pp. 1147–1148.)  Noting *Rider* "involved the question of whether an agency was a 'special district' " within the meaning of Proposition 13, the *Alliance II* court stated, "we decline, as did [*County of Alameda*] and *Howard Jarvis*, to apply *Rider*'s holding regarding special districts under Proposition 13 to the entirely different question of whether a tax measure is a bona fide citizens' initiative." (*Alliance II*, at pp. 1147–1148.)  And, noting that its discussion in *Alliance I* could suggest *Rider* is relevant in the initiative context, the *Alliance II* court stated, "on further reflection, we now agree with, and adopt, the reasoning in [*County of Alameda*] and *Howard Jarvis* that *Rider* is inapposite to the instant question of whether a tax measure is a bona fide citizens' initiative and therefore decline to hold that its 'substantial control' factors apply to this case." (*Alliance II*, at p. 1148.)

Finally, the *Alliance II* court considered whether the measure before it (Measure C) was a bona fide citizens' initiative.  The court stated:  "Here, the individual proponents of Measure C published a notice of intent to circulate an initiative petition, filed that notice with the city clerk, and subsequently submitted petitions signed by the requisite number of city voters (i.e., signatures of 71,646 registered voters).  Measure C was thereafter placed on the ballot for the March 2020 election and received

25

65.24 percent of the votes. Given that all of those requisite steps for a citizens' initiative were satisfied (which CTAN [(i.e., the party challenging the initiative)] does not dispute), *nothing more was required* for Measure C to be considered a bona fide citizens' initiative that required only a simple majority vote." (*Alliance II*, *supra*, 114 Cal.App.5th at p. 1148, italics added.)[17]

In its reply brief in this appeal, the Association acknowledges that, under *Alliance II*, its claim that there was " 'too much government involvement' " in Measure Y no longer provides a basis for a finding the measure is not a bona fide citizens' initiative. But the Association (purporting to apply "[t]he [*Alliance II*] 'bona fide citizens' initiative' test") contends Measure Y should be invalidated based on its "related argument" that the City or city officials " 'controlled' the Measure Y initiative." We disagree. We are not persuaded *Alliance II* made the distinction suggested by the Association or left open the theory it now seeks to pursue.

As discussed, *Alliance II* concluded government support for an initiative tax measure does not convert it into a government measure requiring approval by a two-thirds supermajority (*Alliance II*, *supra*, 114 Cal.App.5th at p. 1149), *and* the court found the *Rider* " 'substantial control' factors" are not relevant to the question whether an initiative is a

_____

[17] The *Alliance II* court also stated that, "assuming arguendo a tax initiative that is substantially controlled by a local government entity or local government officials must be deemed a government-sponsored measure subject to the two-thirds vote requirement, we conclude that CTAN failed to carry its burden to show the City or SDCCC (a nonprofit corporation controlled by the City) substantially controlled Measure C, thereby disqualifying it as a bona fide citizens' initiative. In particular, our independent review of the undisputed evidence shows that none of the *Rider* factors apply to show such substantial control." (*Alliance II*, *supra*, 114 Cal.App.5th at p. 1149; see *id.* at pp. 1149–1150.)

bona fide citizens' initiative. (*Alliance II*, at p. 1148.) We do not read *Alliance II* as holding some other measure of alleged government "control" nevertheless can provide a basis to invalidate an initiative tax measure that has been approved by majority vote. To the contrary, as noted, *Alliance II* found that, because the initiative measure there proceeded through the "requisite steps" for approval (e.g., notice, gathering of signatures, placement on the ballot), "nothing more was required" for the measure to be considered a bona fide citizens' initiative requiring only a simple majority vote. (*Ibid.*) We decline to hold the alleged "control" of Measure Y by city officials provides a basis to declare it is not a bona fide citizens' initiative.[18]

The Association contends briefly that this court "cannot conclusively decide" Measure Y is a bona fide citizens' initiative because "there are insufficient facts in the record" to show Measure Y satisfied what *Alliance II* described as the "requisite steps for a citizens' initiative." (*Alliance II, supra,* 114 Cal.App.5th at p. 1148.) Specifically, the Association states that, "[t]o the best of [its] knowledge, nothing within the existing record demonstrates that 'the individual proponents of Measure [Y] published a notice of intent to circulate an initiative petition, filed that notice with the city clerk, and subsequently submitted petitions signed by the requisite number of city voters,' etc." (Quoting *Alliance II*, at p. 1148.)

The Association's description of the record is incorrect. As noted, the city council resolution placing Measure Y on the ballot states the city clerk

---

[18] Because we are not persuaded the Association's claim of government "control" states a viable theory independent of its abandoned government "involvement" claim, we need not address the Association's appellate arguments that (1) the SAC's broad allegations would be sufficient to state a claim under a control theory, or (2) it could amend the SAC to plead additional facts allegedly showing the City or city officials " 'substantially controlled' the Measure Y initiative."

27

found the requisite number of signatures had been submitted. But in any event, the Association's argument on this point provides no basis for reversal. In its SAC seeking to invalidate Measure Y, the Association makes no allegation that the proper steps to place Measure Y on the ballot did *not* occur, or that any procedural irregularity (such as one pertaining to notice or signature-gathering) occurred. And the Association makes no argument that it could amend its pleading to make any such allegations. The Association has not stated a viable claim to invalidate Measure Y on the ground it is not a bona fide citizens' initiative.

### 2. Government Code Section 50077

In addition to its arguments based on the provisions of the California Constitution that we have discussed above, the Association contends Government Code section 50077 required that Measure Y be approved by a two-thirds supermajority. We disagree.

Government Code section 50077 requires that a special tax proposed by "the legislative body" of a city, county, or district must be "submitted to the voters" and approved by a two-thirds supermajority. (Gov. Code, § 50077, subd. (a).)[19] By its terms, this limitation on a locality's "legislative body" does not apply to voter-sponsored initiatives. As we noted in *Proposition C, supra,* 51 Cal.App.5th 703: "To implement article XIII A,

---

[19] Government Code section 50077, subdivision (a) states: "Except as provided in Section 7282 of the Revenue and Taxation Code, the legislative body of any city, county, or district may, following notice and public hearing, propose by ordinance or resolution the adoption of a special tax. The ordinance or resolution shall include the type of tax and rate of tax to be levied, the method of collection, and the date upon which an election shall be held to approve the levy of the tax. The proposition shall be submitted to the voters of the city, county, or district, or a portion thereof, and, upon the approval of two-thirds of the votes cast by voters voting upon the proposition, the city, county, or district may levy the tax."

section 4 after Proposition 13 passed, the Legislature formally adopted Government Code sections 50075 through 50077, which apply exclusively to the taxing activity of the legislative body of a city, district or local agency. [Citation.] These sections of the Government Code do not address the taxing authority of local electorates." (*Proposition C*, at p. 720.) Government Code section 50077 did not require that Measure Y be approved by a two-thirds supermajority.

Attempting to avoid this straightforward result, the Association contends that because Measure Y refers to Government Code section 50077.5 (a provision pertaining to reverse validation procedures), the drafters of the measure "purposely availed themselves of" the article of the Government Code in which section 50077.5 appears, an article that also includes section 50077. According to the Association, Measure Y thus subjected itself to Government Code section 50077's provision requiring approval by a two-thirds supermajority.

We are not persuaded. At the outset, we note Measure Y expressly states it "shall become effective upon its approval by a simple majority of electors voting on the Ordinance." (Measure Y, § 6.) The Association has not shown that, despite this clear statement, the drafters actually (and unwittingly) adopted a different vote requirement.

The provision of Measure Y that the Association cites on this point (a provision that became Oakland Municipal Code, § 4.58.130) states: "Any action to challenge the taxes imposed by this Ordinance shall be brought pursuant to Government Code section 50077.5 and Code of Civil Procedure sections 860 et seq." (Measure Y, § 2, proposed ordinance § 4.58.130.) Government Code section 50077.5 states that the same Code of Civil Procedure sections that Measure Y cites to directly (Code Civ. Proc., § 860 et

29

seq., which outline validation and reverse validation procedures) apply to actions seeking to validate or invalidate certain voter-approved special tax measures.[20]

We are not convinced by the Association's attempt to derive from these provisions a two-thirds supermajority requirement applicable to Measure Y. Government Code section 50077.5 applies statutory reverse validation procedures to a local government's special tax measure submitted to voters pursuant to Government Code section 50077. (Gov. Code, § 50077.5, subd. (a).) But Measure Y's reference to Government Code section 50077.5 (although perhaps unnecessary, since Measure Y also referred directly to the underlying Code of Civil Procedure sections to be applied) did not transform Measure Y into an enactment by a local government body that was submitted to the voters. Factually, that is not what happened. Measure Y was enacted by voter initiative, not by a local government body, and we will not "ignore reality." (*County of Alameda*, *supra*, 99 Cal.App.5th at p. 234.) Measure Y needed only a simple majority to pass.[21]

---

[20] Government Code section 50077.5, subdivision (a) states in relevant part: "Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure applies to any judicial action or proceeding to validate, attack, review, set aside, void, or annul an ordinance or resolution approved by the voters pursuant to this article on or after January 1, 1986, that levies a special tax, or modifies or amends an existing ordinance or resolution that levies a special tax." (The "article" referred to is Government Code, title 5, division 1, part 1, chapter 1, article 3.5, which includes section 50077.)

[21] In addition to its challenges to Measure Y, the Association asserts for the first time in its reply brief that it was prejudiced when the trial court directed preparation of (but did not actually enter) a judgment before all claims were adjudicated. We decline to address this belated argument.

## III. DISPOSITION

We affirm the judgment, except we conclude Measure Y's three references to the Conservation Society (as specified in this opinion) violate article II, section 12, and must be severed. On remand, the trial court shall enter a modified judgment reflecting this ruling. The parties shall bear their own costs on appeal.

STREETER, J.

WE CONCUR:

BROWN, P. J.
MOORMAN, J.[*]

---

[*] Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:        Superior Court of California, County of Alameda

Trial Judge:        Hon. Michael Markman

Counsel:        Law Offices of Jason A. Bezis and Jason A. Bezis for
Plaintiffs and Appellants.

Ryan Richardson, City Attorney, Maria Bee, Chief
Assistant City Attorney, and H. Luke Edwards,
Deputy City Attorney, for Defendant and Respondent.

Law Offices of Bradley W. Hertz and Bradley W. Hertz for
Real Party in Interest.